STATE BANK OF CHATHAM, NEW YORK, v. W. E. HUTCHINSON *et al.*

No. 11,583  (61 Pac. 443.)

1. DURESS—*Indirect Threats Sufficient to Sustain the Plea.* It is not necessary, in order to sustain a plea of duress of fears excited by threats of arrest and prosecution for crime, and under the influence of which fears an instrument of writing was involuntarily executed, that the threats be directly made by the threatener to the one from whom the writing was extorted, or that they be communicated to him by an agent of the threatener authorized for that purpose. It is sufficient to sustain the plea if the threats be communicated by others, and the natural and reasonable consequence of making them be so to excite the fears of the one who does the act as to overcome his judgment and will.

2. ———— *Mortgage on Homestead—Testimony of Wife as to Threats.* When a wife testifies upon direct examination without objection that she heard of the making of threats to arrest and imprison her husband, without stating from whom she heard them, and that in consequence she became so alarmed concerning him that she executed a mortgage on her homestead against her judgment and will, in order to insure his safety, her evidence, as to the bare fact of what she heard, is not rendered incompetent by a disclosure upon cross-examination that she heard it as a communication from her husband.

3. ———— *Third Person May Relate Communications between Husband and Wife.* When a substantive litigated question in a case is whether a husband made a disclosure of certain information to his wife, a third person who overheard it made may testify to it. Such testimony is not objectionable as being hearsay in character, nor as an evasion of the statutory rule against the admission of the testimony of husband and wife as to communications with each other.

4. ESTOPPEL—*Trust Property—Findings Construed.* Findings of the jury examined, and *held*, that they show that a conveyance of land belonging to a bank, executed by its executive officers, was made upon a sufficient consideration, and was subsequently ratified by the board of directors, and also that the bank, by parting with the consideration received for the deed, is estopped to repudiate the transaction.

Error from Reno district court; MATTHEW P. SIMPSON, judge. Opinion filed June 9, 1900. Affirmed.

*McKinstry & Fairchild,* for plaintiff in error.

*Martin & Roberts,* and *H. Whiteside,* for defendants in error.

The opinion of the court was delivered by

Doster, C. J.: This was an action brought by the State Bank of Chatham, New York, against W. E. Hutchinson, and Annie P. Hutchinson, his wife, on two promissory notes and separate mortgages securing them. One of the notes was for $4000, and the mortgage securing it was given on property in the city of Hutchinson, part of which constituted the homestead of the Hutchinsons. The other note was for $6000, and the mortgage securing it was given on a section of farming land. The Valley State Bank and the Bank of Hutchinson, being claimants to a mortgage lien on the section of land, were made defendants to the action.

W. E. Hutchinson was the president of the Valley State Bank, of Hutchinson. He was indebted to the State Bank of Chatham on a personal obligation in the sum of $10,000. As collateral security to his indebtedness, he had transferred certain notes and chattel mortgages on cattle. One George L. Morris, the president of the plaintiff bank, came to Kansas to investigate the chattel-mortgage collaterals and adjust the Hutchinson indebtedness. He could not find the cattle described in the mortgages nor the makers of those instruments. He accused Hutchinson of fraud, and threatened to prosecute him criminally and cause him to be sent to the penitentiary unless the indebtedness due to his bank was at once paid or secured. These threats were not made to Hutchinson personally but were made to one C. B. Wilfley and one John

J. Welch, officers of the bank of which Hutchinson was president.  They communicated the threats to Hutchinson, who, in turn, communicated them to his wife.  In order to satisfy Morris, as agent of the plaintiff bank, and induce him to forego a criminal prosecution against Hutchinson, the latter, together with Wilfley and Welch, the other officers of the Valley State Bank, agreed with Morris to convey to Mrs. Hutchinson a section of farming land, owned by the bank, in order that the Hutchinsons might give a mortgage on it, along with their homestead and other city property, as security for the debt which Hutchinson owed to the State Bank of Chatham.  This conveyance was made.  The title to the section of land did not stand in the name of the Valley State Bank, but stood in the name of the before-mentioned John J. Welch, one of its officers.  Morris, however, had full knowledge that this land belonged to the bank, and that the title to it was held by Welch merely as a trustee.  After the conveyance of the land the Hutchinsons executed the above-mentioned mortgage of $6000 on it, and also at the same time executed the mortgage of $4000 on their homestead and other city property.  The indebtedness secured by these mortgages was not paid, and action was therefore commenced as before stated.

It will be most convenient to state and discuss separately the two causes of action on the notes and mortgages.

The jury found that the note and mortgage of $4000 on the homestead were executed by Mrs. Hutchinson under the duress of her fears excited by Morris's threat to arrest and criminally prosecute her husband. As before stated, this threat was not made to her, nor was it made to her husband, but it was made to her

husband's business associates and by them communicated to him and by him to her.  Counsel for plaintiff in error contend that a plea of duress by threats can only be sustained by proof of threats directly made to the person from whom the unwilling act was required or the involuntary contract extorted ; or that, if such threat is not thus directly made, but is conveyed through an intermediary, it must be by an agent of the threatener's choosing, specifically designed by him to be an organ of communication.  The evidence did not show that any agency for the communication of the threat was selected by Morris or that he had any specific design that it should be communicated to Mrs. Hutchinson. Notwithstanding this we feel clear that the threats need not be directly communicated.  If one makes threats the natural and reasonable consequence of which is to put another in a state of fear, and if they do put the other in a state of fear, and induce, through the duress of such fear, the performance of an act by him, the one who makes the threats should be held responsible for his wrong.  The effect is one which, in the law of causal connection, proximately results from the unlawful act.  Nor need there be, as we think, a specific design in the mind of the wrong-doer to produce the effect which follows.  It is sufficient that the effect be one which follows as a natural and reasonable consequence from the unlawful act.

1. Duress— indirect threats sufficient.

In the case of *Taylor v. Jaques*, 106 Mass. 291, it appeared that a promissory note was signed under the duress of fears excited by threats not communicated directly by the creditor to the debtor, but communicated by the former to another, and by him to the debtor.  The court held that, "on an issue whether a promissory note was made under duress, evidence is

admissible that the person to whom the payee made threats against the maker reported them to the maker, in the absence of the payee, just before the making of the note." In *Schultz v. Catlin*, 78 Wis. 611, 47 N. W. 946, it was ruled:

"A note signed by a sister because of threats by the payee to prosecute her brother for a crime, and in order to avoid such prosecution, cannot be enforced against her by such payee. It is immaterial that the threats were not made directly to the sister, if they were intended to be communicated to her and were so communicated."

The case of *Giddings v. Iowa Savings Bank*, 104 Iowa, 676, 74 N. W. 21, is quite like the one we have for consideration. In that case a creditor charged his debtor with being a defaulter in respect to a mutual business trust, and threatened him with a criminal prosecution and imprisonment unless he and his wife would execute a mortgage on their homestead to secure the amount of the default. The husband communicated the threat to his wife, and under the duress of her fears excited thereby she executed the mortgage. The evidence of this secondary communication, although that of the husband, was received and held proper. We disagree, however, with that case in one particular. We do not believe that the husband was a competent witness to prove the communication to his wife of the threats which had been made to him. However, the point raised by counsel, and which we have thus far considered only, does not concern the competency of the testimony by which the secondary communication was proved, but it concerns the question whether the communication must be direct, or whether it may be secondary or otherwise more re-

mote.    Upon that question the case cited is an authority.

The case of *Schultz v. Catlin*, supra, intimates that, in order to the reception of the evidence of threats secondarily communicated, there must be a specific design in the mind of the threatener that the communication should be made.    In this we do not agree, but believe that the general rule which holds a wrongdoer liable for the consequences which naturally and reasonably follow his act applies in such case as it does in other and analogous ones.    It also appears in that case, and likewise in *Giddings v. Iowa Savings Bank*, supra, that the reception of the evidence of the secondary communication was rested somewhat upon the theory of an implied agency in the one to whom the threats were made to act as a medium of communication to the third person.    Without holding to the contrary of such theory, we are persuaded that the better ground upon which to rest the rule of admissibility of the evidence is the one which we have above stated.

Counsel for plaintiff in error strenuously object to a portion of Mrs. Hutchinson's testimony, because, as they say, it was given in violation of the statute which prohibits husband or wife from testifying to communications which one of them has made to the other.    The testimony to which objection was made was, in substance, that the witness heard that her husband was threatened with a criminal prosecution and sentence to the penitentiary ; that in consequence she became alarmed and disturbed in mind and overpowered in will, and executed the mortgage on her homestead to avert the threatened calamity.    During the examination in chief of Mrs. Hutchinson, the trial

2. Threats communicated to wife by husband.

court, upon objection, carefully excluded from the jury all of her testimony tending to show a communication to her by her husband. Nothing but the bare fact that she heard of the threats and the effect they produced upon her mind and will were allowed to go to the jury in the first instance. Counsel for plaintiff in error, upon their cross-examination, developed the fact that the story she heard of the threats was a communication from her husband, and they then moved to exclude that part of her testimony from the jury. This motion the court denied. Did the testimony thus elicited upon cross-examination justify the exclusion from the jury of the bare statement, made on direct examination, that she had heard of the making of threats against her husband?

We have given much thought to the question, and are entirely convinced that the rulings of the trial court were correct. No case involving the precise point has been called to our attention by counsel for either side, nor have we, with research, been able to find a case in point. The question, therefore, appears to be one of first impression, and, in the lack of precedent, to be determined upon reason. The witness did not, upon her direct examination, testify to any communication from her husband. She testified only to a fact—a fact which might have been learned (although such was not the case) from others than her husband. What she stated was not as a communication from her husband, but as a fact, to wit, the story of the threats. The testimony thus far was unobjectionable. Could it be made objectionable by a cross-examination disclosing the sources of the wife's information? Clearly not. To do so would have withdrawn from the consideration of the jury all testimony as to the cause of the making of the home-

stead mortgage, and would have left the witness's testimony as to a motive for that action without any rational explanation. All that would have been left of the witness's testimony would have been that she made the mortgage and the state of mind in which she made it. A single word beyond that, to show that her state of mind was induced by a story of threats against her husband, would be, in the theory of counsel for plaintiff in error, incompetent and objectionable, provided the story was heard from the husband. That theory is not sound; it is not supported by any fair interpretation of the statute.

The statute forbids the testimony of husband or wife as to conversations between each other, but the bare statement of a wife that she heard that her husband was to be arrested is not the statement of a conversation. She is entitled to go that far in explanation of the inducement to her action. The substantive litigated question in the case was whether the wife heard an alarming story as to her husband; not the words in which the story was told, nor that it was told to her by her husband. A litigating party cannot deprive his antagonist of the right to prove that substantive fact by showing that the information as to it came from the husband. A statement of the matters testified to by the witness in question, and necessary to be proved, put in the logical order of their development at the trial, shows this:

"Ques. Did you make the mortgage in suit? Ans. I did.

"Q. Why did you make it? A. I was overcome by the fear that unless I did my husband would be arrested and imprisoned.

"Q. Why did you have such fear? A. I heard that he was accused of a crime and threatened with a prosecution."

This was as far as the witness went upon her direct examination. According to counsel for plaintiff in error, a single question and answer upon cross-examination, although nowise going to the making of the mortgage or the reasons for the making of it, destroys the pertinency of the witness's testimony as to those matters:

"Ques. From whom did you hear that your husband was threatened?

"Ans. I heard it from him."

If thereupon the testimony of the witness as to the fact that she had heard of the threats were to be withdrawn from the jury, the benefit of the whole probative connection between cause and effect would be lost, and a necessary link in the chain of proof be destroyed. The statute is not to be so strictly construed and enforced as to produce such a result.

A daughter of the Hutchinsons testified that she overheard the conversation between her father and mother, in which the former disclosed to the latter the threats which Morris had made. Counsel for plaintiff in error also contend against the admissibility of this testimony, upon the ground that it was hearsay in character, and also that its reception was an evasion of the above-mentioned statute declaring the inadmissibility of evidence of communications between husband and wife. Neither of these contentions is sound.

3. Third person may relate communications between husband and wife.

There were three substantive litigated questions in the case: (1) Were threats made? (2) If so, were they communicated to Mrs. Hutchinson? (3) If so, did they produce the claimed effect? As to the second of these, as well as the first, the meritorious question was: Had a verbal act been done—that is, had a

2—62 KAN.

communication been made? That act, if done, was not incidental or collateral in nature. It was one of the three principal litigated matters in the case, and, being such, the performance of the act was provable by the testimony of any one, who, if competent, was a witness to it. The question was not whether Hutchinson's communication to his wife was truthful, but it was whether the communication had been in fact made. The rule is general that where a substantive litigated fact is the speech of a person, one who heard the utterance is admitted to testify to it, and the testimony so received is not hearsay. Mr. Wharton, in his work on Evidence, volume 1, section 254, quite epigrammatically summarizes the rule by saying: "Hearsay is admissible when the issue is hearsay." He then further says: "It may happen that a question at issue is whether certain things were said at a particular time, independently of the truth of what is thus said. If so, proof that such things were said is admissible, though hearsay." The same rule is declared in quite similar language in Taylor on Evidence, volume 2, section 576. It is a general rule in the law of evidence that when the inducing cause of the action of a person is the subject of inquiry, the information upon which he acted may be stated, although it consists of the speech of third persons. A familiar illustration of this rule is afforded in cases of defense against assaults. It is always admissible in such cases to show the making of threats by those who overheard them, and their communication to the defendant, upon the strength of which he armed himself and resisted the assault of his antagonist.

As to the second objection to the reception of the young woman's testimony, that its admission violated the statutory rule of incompetency, but little need be

said. The statute is confined to the class of testimony which it in terms forbids, and it extends to nothing beyond. It forbids husband and wife from testifying to communications made by one to the other, but it does not forbid a third person who overheard the conversation from stating it to the court. In *State v. Center et al.*, 35 Vt. 379, and *Robert Allison v. Peter Barrow*, 3 Cold. (Tenn.) 414, and *Gannon v. The People*, 127 Ill. 507, 21 N. E. 525, 11 Am. St. Rep. 147, third persons were permitted to testify to communications overheard by them between husband and wife. In these cases the communications were in the nature of confessions or admissions against interest, but that did not constitute the ground upon which the testimony was received. If the statute prohibits such kind of testimony, it prohibits it upon the ground of the confidential conjugal character of the communication, irrespective of whether the disclosure of the communication by the one who overheard it would make for or against the party.

The young woman, Miss Hutchinson, was permitted to detail a conversation between herself and her mother concerning the communication of the threats which the husband and father had just made. This was not proper, but, on the other hand, it was not harmful and does not constitute reversible error.

The Valley State Bank and the Bank of Hutchinson joined in a cross-petition in error against the plaintiff in error, Bank of Chatham. The error complained of is the refusal of the court below to adjudge a title in them to the section of land that was conveyed by Welch, the cashier of the Valley State Bank, to Mrs. Hutchinson, and by her and Hutchinson mortgaged to the plaintiff in error to secure $6000 of Hutchinson's indebtedness

4. Conveyance ratified — bank estopped.

to the plaintiff in error.   It is claimed that this judg-
ment should have been rendered, and that, as to the
Valley State Bank and the Bank of Hutchinson, the
mortgage to the plaintiff in error should have been
held void.   This claim is based upon the fact that
George L. Morris, the president of the plaintiff in
error, knew at the time of the conveyance by Welch to
Mrs. Hutchinson that the land belonged to the bank,
and knew that Welch held the title to it as a trustee
only, and also the further fact, as claimed, that the
Valley State Bank received no consideration for the
conveyance which Welch made.   The findings of the
jury in relation to these matters are material to be
stated.   They are as follows :

"15.   Was the only consideration for the deed from
John J. Welch to Anna P. Hutchinson the transfer to
the Valley State Bank of the $10,000 Valley State
Bank stock owned by W. E. Hutchinson and held by
Morris as collateral and the second mortgage on sec-
tion 3 and notes herewith?   Ans. Yes.

"16.   What was the fair market value of section 3,
township 26, range 7, on or about the 6th day Jan-
uary, 1896?   A. $6544."

"26.   Did not Hutchinson give the Valley State
Bank for said section 3, in controversy, a hundred
shares of the stock of said bank and notes executed by
himself and wife to the amount of ten thousand three
hundred and sixty dollars ($10,360), securing same
by a second mortgage upon the section 3 in contro-
versy?   A. Yes.

"27.   Was not the securing by Hutchinson of his
other indebtedness to the bank a part of the considera-
tion that caused the transfer of said section 3 to Mrs.
Hutchinson by Welch?   A. Yes."

"29.   Did George L. Morris have any knowledge or
notice what the consideration was that Mrs. Hutchin-
son gave the Valley State Bank for this section 3 in
controversy?   A. No."

"31. Did George L. Morris have any knowledge or notice of the consideration, if any, that Mr. Hutchinson was to give or did give for the conveyance of this section 3 in controversy? A. No."

"33. Did the Valley State Bank, in its settlement with Hutchinson, obtain from him security for his indebtedness to the bank? A. Yes.

"34. Did Ralph Thompson, as president of the bank, record the mortgage securing the ten thousand three hundred and sixty dollars of notes given by Mr. and Mrs. Hutchinson to the bank as part of the purchase-price of the section 3 in controversy? A. Yes."

"37. Did not the Valley State Bank subsequently sell and assign for a valuable consideration to the Bank of Hutchinson the notes they had received from Hutchinson and wife as part of the consideration for the conveyance of this section 3 to Mrs. Hutchinson? A. Yes.

"38. Did not the officers and directors of the Valley State Bank, at the time it made this sale and assignment to the Bank of Hutchinson, have full knowledge of the facts and circumstances under which the bank obtained the notes and mortgages thus transferred and sold? A. Yes.

"39. Did not the Bank of Hutchinson or its officers have full knowledge of the facts and circumstances under which the Valley State Bank had obtained the notes and mortgages from Hutchinson, as set out in their answer and cross-petition, at the time and before they purchased them from the Valley State Bank? A. No."

"42. Did the Valley State Bank or the Bank of Hutchinson or any one else ever return or offer to return to W. E. Hutchinson or wife all the consideration given by them for the purchase of section 3 in controversy? A. No.

"43. Was it not part of the consideration that Hutchinson gave for this conveyance of section 3 to his wife that he would resign as president and secure his other indebtedness to the bank? A. Yes.

"44. Did not Hutchinson resign from the bank as

its president and give the bank security for his other indebtedness to it?   A. Yes.

"45. Was not the conveyance of this section 3 to Mrs. Hutchinson, and he and his wife giving notes aggregating ten thousand three hundred and sixty dollars ($10,360), and Hutchinson transferring his hundred shares of stock and his resignation as president of the bank, and his giving security for his other indebtedness to the bank all one and the same transaction, considered and completed at one and the same time?   A. Yes."

"51. Did not the Bank of Hutchinson file answer and cross-petition in this suit on the notes given in the Valley State Bank as part of the purchase price of this section 3 in controversy?   A. No."

In addition to the above findings, there are some which establish the correctness of the contention of the cross-petitioners that Morris knew that the land belonged to the bank and not to Welch. It is not necessary to quote them. The last-mentioned findings, however, did not establish the whole of the cross-petitioners' case. The claimed fact that the Hutchinsons paid no consideration to the Valley State Bank for the conveyance of the land must likewise be established; but as to that the cross-petitioners have failed. The above-quoted findings show, contrary to the contention made, that the Hutchinsons did pay a consideration for the land; and they furthermore show, what is perhaps of equal importance, that, irrespective of the ignorance of the directors of the Valley State Bank concerning the conveyance at the time it was made, and their consequent ignorance of the claimed *ultra vires* act of Welch in making it, or his fraud in making it, they ratified the act of making it. Findings Nos. 26 and 27, above quoted, show that the Hutchinsons paid a consideration for the conveyance of the land, and

findings Nos. 37 and 38 show that the directors of the Valley State Bank, with full knowledge of all the facts and circumstances under which it obtained the consideration paid by Hutchinson, sold and transferred such consideration to the Bank of Hutchinson. In the face of all this, it is not possible to uphold the contention of the cross-petitioners.

It is claimed that, so far as the transfer by Hutchinson to the Valley State Bank of the stock held by him in that institution was concerned, it was void because of the lack of power in a bank to purchase its own stock, and the case of *German Savings Bank v. Wulfekuhler*, 19 Kan. 60, is cited as decisive of the proposition. Without undertaking to determine the applicability of the law announced in that case to the facts of this one, but conceding its applicability, the transfer of the stock was not the only consideration paid. It might also be admitted that the resignation of Hutchinson as president of the bank was not a valid consideration for the transfer of the land to him, and it might also be conceded, for argument's sake, that the giving by him of security for his preexisting indebtedness to the bank was not a sufficient consideration. Conceding all that, there still remains the fact, as found by the jury, that Hutchinson and his wife executed to the bank, as a consideration for the transfer of the land, their notes amounting to $10,360, and secured such notes by a second mortgage on the land. These were the notes and this was the mortgage which the Valley State Bank, instead of returning, as it should have done if it desired to repudiate the transaction, kept, after its directors, its board of governing authorities, became possessed of full knowledge of the transaction, and which, after acquiring

such knowledge, it sold and transferred to the Bank of Hutchinson.

It is no sufficient answer to say that the Hutchinsons were insolvent and unable to pay the purchase-price of the land as represented by their notes and mortgage of $10,360. They were not known to be insolvent so as to justify the charge that the bank officials knew that they were getting nothing for their land. The fact by no means appears that they were insolvent, but on the contrary it appears, by transactions had a short time thereafter between Hutchinson and his wife, that the former was possessed of a considerable amount of personal property, estimated at about $9000 in value, which he transferred to his wife, but which in her hands was liable to the payment of the notes as well as in his, because the notes were signed by both of them. It appears, too, by the finding of the jury, that at the time the second mortgage on the land was given it was worth several hundred dollars more than the first mortgage, notwithstanding the remarkably low estimate of value placed upon it by the jury.

Subsidiary and minor claims of error are made by both the plaintiff in error and the cross-petitioners in error. We have given careful consideration to all of them. None of them is availing. The judgment of the court below will therefore be affirmed as against both the complainants in error.