No. 24,220.

THE BLAIR MILLING COMPANY, *Appellant,* v. A. H. FRUITIGER, *Appellee.*

SYLLABUS BY THE COURT.

1. EMBEZZLEMENT—*Obligation of Embezzler to Make Restoration—Consideration for Note Given in Settlement of Civil Liability.* One who embezzles money is under a legal and moral obligation to restore the amount misappropriated to the party from whom it was embezzled, and this obligation affords adequate consideration for notes and security given for restitution or payment.

2. SAME—*Promissory Note Given to Settle Civil Liability—When Not Compounding a Felony.* Before one who has become a surety on notes given in settlement of a civil liability arising from an embezzlement can avoid liability upon the grounds that they were given for an illegal consideration and to compound the embezzlement, it devolves upon him to show that they were given under duress or upon an agreement to conceal the crime, stifle a prosecution therefor or withhold evidence in relation thereto.

3. SAME—*Promissory Note—Insufficient Evidence to Show Illegal Consideration.* The evidence examined and held to be insufficient to show that the notes in question were based on an illegal consideration.

Appeal from Atchison district court; WILLIAM A. JACKSON, judge. Opinion filed May 12, 1923. Reversed.

*James W. Orr, C. J. Conlon, E. W. Clausen,* all of Atchison, and *L. C. Uhl,* of Smith Center, for the appellant.

*J..M. Challis,* of Atchison, *F. W. Mahin,* of Smith Center, and *W. E. Mahin,* of Norton, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by the Blair Milling Company to recover from A. H. Fruitiger upon two promissory notes, one for $2,000, dated February 13, 1912, and the other for $80.75, dated June 10, 1912. The notes were executed by M. J. Hart, M. L. Hart and the defendant, A. H. Fruitiger. Neither of the Harts could be served with process and the case proceeded against Fruitiger alone. The defendant prevailed and plaintiff appeals.

Fruitiger admitted the execution of the notes, but set up three defenses. First, that the notes were given to reimburse the plaintiff for an embezzlement confessed by one of the makers, M. J. Hart, a brother-in-law of the defendant, and that he executed them under the threat that if defendant did not execute the notes, the plaintiff would cause the arrest and prosecution of Hart and thus bring disgrace upon him and the family. Second, they were given for the purpose of preventing and suppressing a criminal action against Hart, and that the plaintiff agreed that if the notes were executed no prosecution would be instituted. The third defense was, that plaintiff as a consideration for executing the notes agreed to reemploy Hart at a salary of $100 per month; that his earnings during the time he was thereafter employed should be credited upon the notes; that thereafter Hart was so employed by the plaintiff for sixteen months, but that no part of his salary had been credited upon the notes.

Special interrogatories were submitted to the jury and these with the answers are as follows:

"Question 1. Did W. A. Blair or H. H. Hackney tell the defendant, A. H. Fruitiger, that unless the defendant signed the note for $2,000 and the contract, that a criminal prosecution would be brought against M. J. Hart? Answer. No.

"Question 2-3-4. Refused.

"Question 5. Did W. A. Blair or H. H. Hackney, while acting for and in the interest of the plaintiff, promise the defendant, A. H. Fruitiger, that if he would sign the note and contract, they would refrain from bringing a criminal prosecution against M. J. Hart? Answer. Yes.

"Question 6. Refused.

"Question 7. Do you find that the defendant, A. H. Fruitiger, signed the note in question upon the understanding and agreement with the plaintiff that the said M. J. Hart should be retained in the employ of the plaintiff, and that all or a substantial portion of his earnings as such employee should be credited as payments upon the note in controversy? Answer. No.

"Question 8. Do you find that the principal of the notes in controversy herein represents moneys and funds which the plaintiff claimed that M. J. Hart had embezzled from it? Answer. Yes.

"Question 9. Refused.

"Question 10. Do you find that it was understood and agreed between the plaintiff and M. J. Hart and the defendant that the said M. J. Hart was to make installment payments upon the note herein out of his earnings from month to month, notwithstanding the fact that such notes by their terms might not be due? Answer. No."

It appears from that part of the evidence about which there is no substantial dispute that M. J. Hart had been employed by the plaintiff at Atchison as bookkeeper and treasurer for about eight years. On February 12, 1912, he went to the office of the chief of police and confessed to the officers in charge there that he was short in his accounts with the plaintiff, had embezzled about $2,000 and said to them, "I have come to take my medicine." The officers telephoned to W. A. Blair, the president of the company, to come to the police station, and when he went there he met Hart, who confessed that he had embezzled the money of the plaintiff, which he estimated to be about $2,000. At that time he indicated that his purpose was to plead guilty and take the consequences. Blair, who knew his family and had sympathy for them, advised against it, telling him that if he would arrange for a settlement of the amount misappropriated he might come back to the milling company and continue his employment as before. At first he said that he could not do that as everyone in the office would know of his offense, but later he agreed to arrange for the payment of the misappropriated money and did return to work. In order to provide for his defalcation he telegraphed to the defendant, a brother-in-law who lived in Smith county, and he came at once to the Hart home in Atchison and was then told of the embezzlement and of the proposal to give security for the amount taken. Shortly afterwards Blair and H. H. Hackney, vice president of the company, met the defendant at the Hart home, talked over the shortage, with the result that the defendant signed the note for $2,000, and also a contract that if an audit of the books should disclose that the

shortage exceeded $2,000 another note for the excess would be signed. In the early part of June an audit was completed and it was found that the shortage was $80.95 more than the $2,000, and for this amount the second note was given.

There is a conflict in the testimony respecting the claim that the notes were executed because of threats of arrest and prosecution of Hart. Defendant testified that Blair and Hackney came to the Hart home and threatened to have Hart arrested and sent to the penitentiary if the notes were not executed and that because of these threats he was induced to sign the notes. Blair testified that the defendant had been fully informed about the embezzlement by Hart before Blair met him. When they met defendant inquired if Hart would be taken back to work for plaintiff in case the notes were given and Blair assured him that he would be given employment and was already back in the position he formerly held. Hackney, the vice president, was present when the settlements were made, and he testified that nothing was said about the prosecution of Hart, no threats were made nor any agreement relating to it. He said that Fruitiger inquired, if the notes were given would they keep Hart in the service of plaintiff, and he replied that if the notes were satisfactory as security, they would be accepted; that Fruitiger made a property statement and upon that the contract and note for $2,000 were then executed and accepted. He further said that no threats of prosecution were made, nor was there any agreement not to prosecute Hart in case the notes were given. Most of the evidence in the case was directed to the question of duress and that the notes were executed because of threats of the officers of plaintiff that Hart would be arrested and prosecuted for embezzlement if they were not given. This question, however, has been taken out of the case by the specific finding of the jury that there were no threats or coercion. Likewise it was found that there was no agreement by plaintiff that the salary or earnings of Hart should be credited on the notes from month to month while he remained in the employ of plaintiff, although the notes were not due for three years after they were given.

Nothing was left in the case except the fifth finding, that Blair and Hackney promised if the defendant would sign the note and contract, plaintiff would refrain from bringing a criminal prosecution against Hart. The plaintiff contends and with good reason that the evidence does not sustain that finding or the general verdict in

favor of defendant. Of course, if the contract and notes were signed with the purpose of stifling prosecution or for the concealment or withholding of testimony of crime so as to obstruct the course of justice, they were absolutely·void. (*Friend v. Miller*, 52 Kan. 139, 34 Pac. 397.) While the compounding or stifling of a prosecution for crime is contrary to public policy and law, and can never be a valid consideration for a contract, it does not necessarily follow that notes or securities taken by an injured party in settlement of the loss sustained by an embezzlement of his money are void. In relation to the compromise and settlement of the civil liability resulting from embezzlement or theft, the rule was laid down in an early day· as follows:

" 'In all cases of offenses which involve damages to an injured party, for which he may maintain an action, it is competent for him, notwithstanding they are also of a public nature, to compromise or settle his private damage any way he may think fit; but that an agreement for suppressing evidence, or for stifling or compounding a criminal prosecution for a felony, is void.' 2 Chitty on Contracts, 991." (*Johnston, jr., v. Allen*, 22 Fla. 224, 235.)

The embezzler was under a legal and moral obligation to the plaintiff for the loss suffered by his wrong. That obligation of itself is a clean and valid consideration for the notes given to plaintiff. It was not unlawful for him to make restitution, and not having the money with which to do so, it was not unlawful for him to voluntarily obtain and give security for payment at a later time. It is not against public policy for a thief to return the property stolen to the owner, or an embezzler to restore the money to the person from whom it was embezzled. In 13 Corpus Juris, 453, it is said:

"To render an agreement illegal as an agreement to compound a crime, it is essential that there shall be an agreement not to prosecute, although the agreement may be either express or implied. The law does not prevent one whose property has been stolen or whose rights have been interfered with through the commission of a crime to compromise with the wrongdoer, if it is not agreed either expressly or impliedly that the prosecution for the offense shall be suppressed or stayed. . . . Even a promise not to prosecute is not illegal, where it is made, not for the sake of gain, but from motives of kindness and compassion, or on account of relationship. And mere threats to prosecute, while they may amount to duress or undue influence, so as to render a promise voidable, will not avoid an agreement made by a defaulter for the purpose of making reparation to the person injured by his misdoing, if there is no agreement not to prosecute."

Many cases supporting this text are there cited. The making of restitution or the giving of security therefor is something to be

Milling Co. v. Fruitiger.

commended rather than condemned, and if there was no duress by plaintiff, no use of the criminal proceedings to obtain the money or security or other private gain for plaintiff, and no concealing of the crime or stifling of a prosecution or withholding of evidence as a consideration for the notes, the embezzler and the defendant are equally liable for their payment. Although the notes grew out of a crime committed by Hart, if the consideration was something apart from the smothering of the crime or the perversion of the use of criminal law, Hart cannot repudiate the notes, and if they bound him, the defendant who signed them as surety is also bound to the same extent. (*Bibb v. Hitchcock*, 49 Ala. 468.)

The question arises: Was there an agreement between the plaintiff and those who signed the notes, to compound or conceal the offense, to stifle the prosecution or withhold testimony as to the embezzlement? There was no concealment nor any occasion for concealment. Hart had voluntarily made an open confession of the offense to the police officers and others before the plaintiff even learned that an offense had been committed. It is contended that Blair's testimony establishes that an agreement not to prosecute was the consideration for the execution of the notes. The plaintiff had taken a surety bond for the good conduct of Hart as its employee and covering any defalcation of his. The testimony relied on is as follows:

"Q. Why did you the morning that you went to the police station send for Mr. Hart's brother or go and see his brother when you had this bond covering any defalcation? A. I thought perhaps some arrangement might be made.

"Q. What arrangement did you mean? A. I did not care to report it to the company; the bonding company.

"Q. Is it not a fact that you took these notes from Mr. Fruitiger for the purpose of keeping the bonding company from starting a criminal action against Hart? A. I did not know what they would do. Not necessarily.

"Q. Answer the question. What do you mean by not necessarily? A. I did not know whether the bonding company would prosecute Hart or not.

"Q. Then why were you concerned about getting the note instead of the bonding company's bond? A. Sympathy for the family.

"Q. In what respect would that be sympathy? A. They might prosecute and they might not.

"Q. Then it was for the purpose of eliminating any chance for the prosecution in not relying on the bond? A. Yes, that might be considered that way."

It was manifest that the witness was speaking of what the bonding company might or might not have done, if the plaintiff had

called on that company to make good the defalcation. However, the evidence given falls far short of an admission that an agreement was made by the plaintiff not to prosecute Hart if the loss was paid or secured. In the same connection he said that he did not choose to rely on the bond and call the bonding company to make good the loss because of sympathy for the family of Hart. The motive that actuated him in not calling the bonding company was not for the benefit or gain of the plaintiff, but was the humane and charitable one of protecting Hart's family. It has been held that the validity of a promise not to prosecute depends upon the motive for which it was made. In *Ward v. Allen*, 2 Metcalf, 53, it is held that if a promise had been made not to prosecute for forgery, it would not necessarily vitiate the contract. To render such a promise illegal so as to vitiate a contract it must appear to have been made "for the sake of gain and not merely from motives of kindness and compassion." That this was the motive that actuated Blair in settling with Hart instead of enforcing the liability against the bonding company is reënforced by the conceded fact that the plaintiff gave Hart back his job, and retained him for sixteen months thereafter and until he voluntarily withdrew from the employment of plaintiff. There is nothing in the quoted testimony which shows that the consideration for the notes was an agreement by the plaintiff not to prosecute. His statement that his failure to report and call upon the bonding company instead of accepting security for the payment of the loss might be considered as for the purpose of eliminating any chance for the prosecution by the bonding company, was not an admission that an unlawful agreement had been made by plaintiff as the consideration for the execution of the notes. At any rate, as the statement was made it does not carry the implication that he had agreed with the defendant and others not to prosecute, but rather that he did not know what the bonding company would do. The fact that the officers of the plaintiff did not institute the prosecution does not carry the implication of an unlawful purpose. While it would have been the duty of the plaintiff if a prosecution had been begun to furnish all evidence within its control, as to the embezzlement, the law did not require it to file a complaint or institute a prosecution against Hart. It is a common and commendable practice for the person wronged to make such a complaint, and as it may conduce to the prosecution and prevention of crime it may be regarded as promotive of public good.

Milling Co. v. Fruitiger.

The interest which impels the wronged party to bring the criminal to justice, whatever his motives may be, is one of the means upon which the public relies to secure the enforcement of law, but we have no statute compelling him to file a complaint and institute a prosecution. In *Moog v. Strang*, 69 Ala. 98, a case where it was claimed that a mortgage had been given to suppress a criminal prosecution for embezzlement and a bank had taken some steps to institute a prosecution, and after a compromise of the civil liability had been made, the prosecution was dropped. In considering the question the court said:

"The bank was under no legal compulsion to prosecute. Like a natural person, it could elect to do so or not. The law does not undertake to imperatively control the exercise of this power of election or legal option, but it merely forbids all agreements between the parties, stipulating to influence it, by stamping them with the vice of invalidity. Nor does it any more seek to control the hope or expectations of the offender. He may very reasonably, in many cases, expect that the prompt settlement of a discovered defalcation may tend to paralyze the energy of an incipient prosecution, and, however reprehensible the motives of the parties, they are not cognizable by the courts so long as their minds fall short of concurring in an agreement, express or implied, to compound or not to prosecute, as the consideration, in part or in whole, of the payment of the debt or damages resulting from the crime committed." (p. 101.)

The only testimony as to what transpired when the notes were arranged for and also when they were executed was given by the defendant, Blair and Hackney, and in none of it is there substantial support for the contention that the consideration of the notes was tainted by an illegal agreement. In the early case of *Hoover v. Wood*, 1 Kan. 509 (Dass. Ed.), it was held:

"In order to constitute a defense, on the ground that the note was given for the amount alleged to have been embezzled, there must be a positive and distinct averment that the receiver agreed and stipulated that he would conceal the felony, abstain from prosecution and withhold evidence in relation thereto." (Syl.)

We find no evidence that measured up to what is necessary to establish illegality in the consideration of the notes, none that shows that the plaintiff or its officers agreed to conceal the embezzlement, stifle prosecution or withhold evidence relating to it.

It follows that the verdict must be set aside, and there being no evidence to support the alleged defenses, the judgment is reversed with directions to enter judgment upon the notes in favor of plaintiff.