No. 30,593.

F. R. Jones, *Appellant*, v. Joseph Prickett, H. D. Prickett, and Iva Prickett, *Appellees*.

(11 P. 2d 1008.)

Opinion filed June 4, 1932.

*R. L. Hamilton*, of Beloit, for the appellant.
*Ralph H. Noah*, of Beloit, for the appellees.

The opinion of the court was delivered by

Hutchison, J.: This action is upon a promissory note for $1,000 given to the Farmers State Bank of Simpson, Kan., by the three defendants and two others, and assigned to the plaintiff herein one day before it became due. Two payments have been made on the note by the two other signers, not made defendants here, which reduced the balance to $565.40 when this action was commenced. The answer admitted the execution of the note, but alleged it was signed without any consideration and at length alleged that Glen Prickett, the son of the defendants, H. D. Prickett and Iva Prickett, and brother of the defendant, Joseph Prickett, had checks outstanding for which there were no funds in the bank; that he had also given a note to the Farmers State Bank secured by a mortgage on cattle; that he had given two other parties mortgages covering in part the same cattle; that Mr. Stehley, cashier of the bank, told the defendants, the parents and brother of Glen Prickett, that Glen was guilty of the crime of disposing of mortgaged property of the value of more than $20 and of remortgaging property of more value than $20 and that the defendants, in order to compound and settle said felony, signed the note in this action; that the other two parties to whom mortgages had been given were going to prosecute Glen; that the defendants believed these statements of the cashier, and in fear of

his being prosecuted signed the note. A reply in the form of a general denial was filed and the cause was tried before a jury, which rendered a verdict for defendants and answered a number of special questions. Judgment was rendered on the verdict for defendants, and plaintiff appeals.

In the trial the court placed the burden upon the defendants, instructing that the plaintiff was entitled to recover on the note unless the defendants proved one or more of their defenses. The court instructed there were three defenses: (1) that the note was given for the purpose of preventing a criminal prosecution; (2) that the defendants were induced to sign the note through fear that Glen would be prosecuted criminally for disposing of mortgaged property; and (3) that the note was without consideration. In the next instruction the court withdrew from the consideration of the jury the first defense, leaving the second and third, namely, duress and want of consideration.

The briefs dwell at length upon the question of whether the plaintiff was a holder in due course. The only reason for his not being a holder in due course was the fact that he had heard of the claim of duress before he had parted with the consideration for the note, which will make that matter depend wholly upon the success or failure of the proof of duress. Likewise the want of consideration goes with the defense of duress as there was no evidence except that of duress to show a lack of consideration; the very allegations of the answer, if stripped of the duress features, make the note an accommodation one for the son and brother, whom the allegations of the answer show received full consideration therefor.

The following answers to special questions relate to the subject of duress:

"5. Were the acts and statements of C. W. Stehley made to defendants through a desire for gain? A. Yes.

"6. If you answer question No. 5 'yes,' then state in what way the gain was to be had. A. To protect interested parties.

"7. At the time the note in question was signed by defendants did Stehley or the Farmers State Bank of Simpson have enough money from the sale of Glen Prickett's live stock and other personal property with which to pay its mortgage in full? A. No.

"8. Was any of the money received from the sale of cattle and other property sold by Glen Prickett and C. W. Stehley for cattle belonging to Joseph Prickett? A. Yes.

"9. If you answer the foregoing question 'yes,' then how much of said money was for cattle belonging to Joseph Prickett? A. $508.50.

"10. Before the defendants signed the note were they advised by the then county attorney, Ralph H. Noah, that Glen Prickett could be prosecuted for a felony? A. Do not know.

"11. Before the defendants signed the note were they advised by the then county attorney, Ralph H. Noah, that selling mortgaged property was a felony? A. Yes."

The last two answers do not help on the question of duress in any way or manner. The jury did not know whether the county attorney advised defendants that Glen could be prosecuted for a felony. It was the theory of the defendants that he had so advised them, but the jury was not able from the evidence to find that he had. The other answer, that the county attorney advised them that selling mortgaged property was a felony, was only what the law presumes everyone to know. The answer alleged it was a felony. If it had only been a misdemeanor and the county attorney had exaggerated the matter and told them it was a felony, that would have contributed to arousing the fear alleged. But he simply told them what the law was, which they were presumed to know, and did not, as far as the jury could determine, apply that law to Glen's conduct or case. The undisputed evidence is that shortly prior to the signing of this note Glen owed the Farmers State Bank of Simpson two notes, one for $1,726.44 and the other for $1,000, making a total of $2,-726.44; that he made a sale of his mortgaged cattle which brought about that amount, including amount from sale of cattle belonging to his brother Joe, all of which funds were turned over to the bank. After the sale the cashier sent for Joe, as he knew before the sale that Joe was claiming some of the cattle sold by Glen. Joe and Glen figured out the amount belonging to Joe as $508.50. The testimony of Joe shows that he stated that he thought he would go and get the cattle, but Stehley did not want him to, and Stehley gave him a check for them that day, which was before he signed the note in question. On cross-examination Joe said that the next day, when they had signed the note sued on in this action, the cashier called him in and gave back to him a certain note he had signed the night before when he received from the cashier a check for his cattle. He says it was not for $1,000, but says he does not remember the amount of it. A memorandum introduced in evidence, said to have been made up when Joe was present, shows that the proceeds of the sale and $1,000 more covered everything Glen owed the bank, the two other mortgage holders and the $508.50 for Joe.

At this conference at the bank Joe says the cashier asked him if he knew what Glen had done, that he figured he was in a pretty bad hole and it would take some money to clear him, and he figured something was going to be done to him. The evidence of the defendants shows that Joe told his father and mother about what the cashier told him about Glen, and Joe and his mother then went to see the county attorney, and then they and the father went to the bank and there signed the note, and the mother says the cashier "made it very plain to them that if they didn't raise $1,000 that there would be something done with him (Glen) and, of course, we all knew what the offense was, he didn't need to name that," and "he wanted to know if we didn't know what the penalty was for any boy to sell mortgaged property." All three defendants said they would not have signed the note if they had not thought Glen would have been prosecuted criminally if they didn't sign it. They made financial statements at the same time and entered into the following agreement, which was left at the bank:

"DEC. 12, 1929.

"It is agreed by Rae Prickett, Joseph Prickett, H. D. Prickett and Mrs. H. D. Prickett, his wife, that the attached note will be paid as follows: $266 will be paid by Rae Prickett, $266 will be paid by H. D. Prickett and Mrs. H. D. Prickett and the balance will be paid by Joseph Prickett, it being understood also that Hilma Carlson will pay $200 on this note, and when $200 has been paid together with interest, she shall be relieved from any more liability on said note. It is further understood that should any of the stipulated payments not be paid the liability of the others will hold against each and every one of them until said note is paid in full."

Rae Prickett, a brother of Joe and Glen, and Hilma Carlson, a school teacher, promptly paid their proportions of the note in full.

Joe was the original source of information to the parents, and all the information they had as to threats were conveyed to them by Joe, except what is above quoted from the mother's testimony as to the cashier making it plain to them and asking a question. The father did not talk to the cashier, nor with the county attorney. Ordinarily threats conveyed to others by an intermediary are none the less such as might produce fear and accomplish the essentials of duress (*Smith v. Bank*, 90 Kan. 299, 133 Pac. 428; and *Bank v. Hutchinson*, 62 Kan. 9, 61 Pac. 443), and the parents in this case might possibly have occupied such a position in connection with their signing this note under ordinary circumstances, but where the one conveying such information is directly interested, as Joe was in this case, such

communications lose some of their force and effect, and every rule of reason compels the thought that Joe had the additional purpose in mind of effecting the return of his own note which he had put up the night before in order to get a check for the value of his cattle sold by Glen. There is not a word of testimony about threats or putting Joe in fear about signing the note the day before. One thing is certain, that Joe did not act to his detriment in signing the present note, for he thereby got back his note for an amount he could not remember. The purpose of the cashier of coercing these defendants is exceedingly weak, to say the least. The undisputed figures show the bank had nearly or about enough cash to meet all its claims before deducting the amount of Joe's claim. The thing accomplished by the bank was not an undue advantage, as is necessary for duress. When Joe told the story of the threats to his parents he was undoubtedly impressed with his own interest in getting them to share his own obligation on the note he gave the night before.

We think the full story told by the defendants themselves falls short of meeting the essential requirements of duress, as defined in the recent case of *Western Paving Co. v. Sifers,* 126 Kan. 460, 268 Pac. 803, as follows:

"To constitute duress by threats the actor's manifestation must be made for the purpose of coercing the other; must have for its object the securing of undue advantage with respect to the other; must be of such a character that it is adapted to overpower the will of the other and is reasonably adequate for the purpose; must in fact deprive the other of free exercise of will; and must cause the other to act to his detriment. The evidence to establish duress must be substantial—not merely some evidence—and the court is not obliged to submit to the jury evidence which does not measure up to the required standard of proof." (p. 463.)

We have no evidence as to the state of mind of any of these defendants. We only have their statements that they would not have done so but for the threat. This is not sufficient if they were in fact able to exercise their free will or judgment in the premises.

"The test in determining whether there was duress is not so much the means by which the father was compelled to execute the mortgage as it is the state of mind induced by the means employed—the fear which made it impossible for him to exercise his own free will." (*Williamson v. Ackerman,* 77 Kan. 502, syl. ¶ 2, 94 Pac. 807.)

"It is sufficient to sustain the plea of duress if the threats were communicated to her by the son and the natural and reasonable consequence of making them was to excite the fears of the mother so as to overcome her judgment and will." (*Smith v. Bank,* 90 Kan. 299, syl. ¶ 2, 133 Pac. 428.)

"Threats of personal violence or of criminal prosecution to amount to duress must be of such a character or made under such circumstances as to destroy the will of the one threatened to such an extent as to compel him to act in a manner contrary to his will and to his detriment." (*Riney v. Doll,* 116 Kan. 26, syl. ¶ 4, 225 Pac. 1059.)

The situation in this case is decidedly different from that in the case of *American Nat'l Bank v. Lipe,* 123 Kan. 674, 256 Pac. 967, where the bank officers called up by telephone the mother of a young man who was involved in some questionable financial transactions and insisted upon her coming at once to avoid something serious being done with him, and when she arrived told her plainly what they intended to do if she did not fix it up at once, and took her to the office of their attorney and had her execute satisfactory security.

The answers to special questions 5 and 6 are not consistent with the theory and definition of duress. They find that the cashier made the statements through a desire for gain and that the gain was to protect interested parties. From the record it would seem that the interested parties were mainly the holders of the other two mortgages and Joe. It is contrary to reason to think of Joe being unable through threats and fear to exercise his own free will and judgment, either when he signed the first note and got a check at the same time for $508.50, or the next day when he signed the note involved in this action with four other signers on it and got back the note he alone had signed the day before. Threats communicated to the parents through such an interested channel are not within the definition of duress as above quoted.

The appellant has assigned numerous errors, but it is only necessary to consider the insufficiency of the testimony to support the verdict. (*Milling Co. v. Fruitiger,* 113 Kan. 432, 215 Pac. 286.)

It was error to overrule the demurrer of the plaintiff to the evidence of the defendants and also to refuse to give a peremptory instruction to return a verdict for plaintiff.

The judgment is reversed and the cause is remanded with instructions to render judgment for plaintiff.