## GILL v. REVELEY et al.

No. 2563.

Circuit Court of Appeals, Tenth Circuit.

Jan. 6, 1943.

Charles Hill Johns, of Oklahoma City, Okl. (Roger L. Stephens, of Oklahoma City, Okl., Frank L. Bates, of Kansas City, Kan., and Howard E. Payne, of Olathe, Kan., on the brief), for appellant.

Frank H. Terrell, of Kansas City, Mo., for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Deane Gill sued O. G. Bitler, J. H. Reveley, and Westgate-Greenland Oil Company to recover damages, alleging that the defendants formed a scheme to obtain from him certain shares of corporate stock at less than its fair value; that by threats of criminal prosecution, he was subjected to duress; and that while under duress, he agreed to sell and did sell such stock at a price far below its fair value. The defendants answered separately; summary judgment was entered in favor of Bitler; the case was tried to a jury as between plaintiff and the two remaining defendants; at the close of the evidence adduced by plaintiff, the court instructed a verdict for such defendants; judgment was entered upon the verdict; and plaintiff appealed from the latter judgment but not the former.

The action of the court in directing the verdict is challenged. Contradictions and conflicts of evidence are for the jury. And where the evidence and the inferences fairly deducible from it are such that men of reasonable minds may honestly draw different conclusions therefrom, the question is one of fact to be determined by the jury. Central Surety & Ins. Corporation v. Murphy, 10 Cir., 103 F.2d 117. But it is a rule of consistent application in the United States courts that while a case should not be lightly withdrawn from the jury, a verdict should be directed where the evidence, together with all the inferences which justifiably could be drawn from it, is without dispute, or is conflicting but of such overwhelming or conclusive nature that if a verdict were returned for the plaintiff or the defendant, as the case may be, the exercise of sound judicial discretion would compel the court to set it aside. Randall v. Baltimore & Ohio R. R. Co., 109 U.S. 478, 3 S.Ct. 322, 27 L.Ed. 1003; Delaware, L. & W. Railroad v. Converse, 139 U.S. 469, 11 S. Ct. 569, 35 L.Ed. 213; Southern Pacific Company v. Pool, 160 U.S. 438, 16 S.Ct. 338, 40 L.Ed. 485; Patton v. Texas & Pacific Railway Co., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361; Slocum v. New York Life Ins. Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, Ann.Cas.1914D, 1029; Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L. Ed. 720; Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed.

819; Central Surety & Ins. Corporation v. Murphy, supra; Farr Co. v. Union Pac. R. Co., 10 Cir., 106 F.2d 437; Lehmitz v. Utah Cooper Co., 10 Cir., 118 F.2d 518.

The gist of the cause of action pleaded was duress, and the burden of proof rested on plaintiff. Accordingly, it was necessary that he submit evidence establishing a prima facie case of duress before he was entitled to have the issues submitted to the jury. It is insisted that the evidence introduced, together with the reasonable inferences which could be drawn from it, was such that men of reasonable minds might honestly draw different conclusions on that question and therefore the court should not have withdrawn the case from the jury. There was evidence which tended to establish these facts. Gill, Bitler and Reveley first became associated in the oil business in 1920. After becoming financially affluent their paths separated, Gill going one way and Bitler and Reveley another. But they were drawn together again in 1930. They caused Westgate Oil Company, an operating company, and Greenland Oil Company, a holding company, to be organized; they owned most of the stock issued by Greenland; that company, in turn, owned all the stock issued by Westgate; and both of these corporations transferred all their assets to the defendant Westgate-Greenland Oil Company, the latter assuming all of the obligations of the former. Gill owned about 200,000 shares of stock issued by Westgate-Greenland. The principal offices of Westgate were in Oklahoma City. In 1930, Gill and his family resided in Fort Worth, Texas, but due to financial difficulties he sent his wife and children to Iowa to reside on a farm there. For about five years he visited his family on the farm from time to time and continued to live with his wife as husband and wife. He then began living with another woman. Westgate established offices in San Antonio, Texas. Gill went there and took the other woman with him. They openly lived together, crossed state lines together, and held themselves out as husband and wife. Her picture and publicity appeared in the society page of one newspaper, publicity appeared in the society page of another, and her picture and publicity appeared in a magazine—she being designated and called Mrs. Deane Gill. Gill went to Iowa, told his wife that he was living with the other woman, and asked her to secure a divorce. Instead of doing so, she moved to Corpus Christi, Texas; and he continued to live with the other woman in San Antonio. Reveley talked with Gill three or four times about his domestic situation, told him that he was going to get into trouble, told him he would get in a jam, said he should quit trying to have two wives, urged him to straighten out his marital difficulties, and suggested that he see his wife and adjust their business; but he did not try to get him to quit living with the second woman. Gill indicated an unwillingness to discuss the matter, said he preferred to attend to it himself, said he realized he probably would get into trouble, and on one occasion walked out of the room. Reveley suggested that he, Bitler and Gill should collateralize their separate obligations to Westgate. Gill owed Westgate about $17,000, his stock in Greenland was pledged to a bank to secure a debt of $12,000, and he needed $5500 in cash. Reveley suggested and it was agreed that Westgate should pay the amount due the bank, furnish the $5500 in cash, and take Gill's stock as collateral for the entire debt; and that was done. Late in April, 1936, Reveley telegraphed Gill that the company demanded that he straighten his marital difficulties as he promised when the last loan was made and that he pay his entire indebtedness due the company by June first. On May first, Reveley and Gill met in the lobby of a hotel in Oklahoma City. Reveley stated that he had come to get Gill's resignation; that his method of living was detrimental to the credit of the company; and that he wanted him to resign, sell his stock, and get out. Gill demurred, and Reveley stated that if he did not do so he would see that the information respecting his method of living was transmitted to the federal authorities and that he would be prosecuted for violation of the Mann Act, 18 U.S.C.A. § 397 et seq., and put in the penitentiary. Gill agreed to resign, wrote and signed the resignation, and handed it to Reveley. They then discussed the sale of Gill's stock at sixty cents per share. Gill stated that it was worth more than that amount. The two went to Bitler's room in the hotel, and Reveley told Bitler that Gill had resigned and agreed to sell his stock but thought sixty cents per share was not enough for it. It was agreed that Bitler and Reveley should make an effort to get more for it from persons at Kansas

City. About four days later Gill wrote Bitler and Reveley at Kansas City stating in substance that he was sure they would make every effort to get him as much as possible for the stock, and concluding with an expression of best regards to both. Three or four days thereafter, Gill went to Kansas City to see Bitler and ascertain how he was getting along with the sale of the stock. Bitler advised him that he did not believe he could get more than sixty cents a share for it. On May 15, the three met again at Oklahoma City and discussed further the matter of the sale. Reveley stated that he would like to buy 15,000 shares but could not pay cash; and it was agreed that Gill would take Reveley's notes for the amount, on condition that a loan be obtained with the notes pledged as collateral. Two written contracts were agreed upon, one between Gill and Reveley covering the 15,000 shares, and the other between Gill and Westgate covering the balance of the stock, all at sixty cents per share. After the terms were agreed upon verbally, Gill left the conference, went to the office of an attorney, had him prepare drafts of both contracts, and later paid him for his services. When Gill returned with the contracts some changes were found necessary in one, and he redrafted it in his own handwriting. The contracts were then executed; Bitler sold much of the stock to persons at Kansas City; and Gill was paid. At the time Gill resigned, he was receiving a salary of $1000 per month; and, according to plans already made, dividends on his stock which were soon to begin would amount to slightly less than the salary. Sometime in 1935, Reveley stated to a third person that Gill was living with the other woman; that it was a pentitentiary offense for them to go out over the country as man and wife; that Reveley was opposed to such conduct and was not going to stand for it in the organization; that Gill's relations were unpleasant and unbearable; that his stock was pledged; that Reveley was going to make Gill resign from the company and was going to take his stock away from him; and that if necessary to stop Gill, he would prosecute him. And sometime in the late spring of 1936, Reveley told such third person that Gill was no longer with the company, and that he had said in the previous conversation that he was going to put Gill out and take his stock away from him. In 1937, Gill and two other individuals acquired some oil property in California.

Westgate was persuaded to take an interest with them in it. For two years after the sale of the stock, frequent correspondence passed between Gill and Westgate, and Gill wrote Reveley a personal letter extending congratulations on a well drilled on property in California. All of it was ordinary correspondence, friendly in tenor, did not contain any direct or indirect reference to duress, and failed to indicate any ill feeling.

■ Under the law of Kansas, a threat of criminal prosecution does not constitute duress and will not defeat a contract unless the person to whom the threat was made became so frightened or was placed in such fear as to overcome his judgment and make it impossible for him to exercise his own free will. Williamson, Halsell, Frazier Co. v. Ackerman, 77 Kan. 502, 94 P. 807, 20 L.R.A.,N.S., 484; Western Paving Co. v. Sifers, 126 Kan. 460, 268 P. 803; Jones v. Prickett, 135 Kan. 640, 11 P.2d 1008.

Here Gill testified that the threat of Reveley made in the lobby of the hotel frightened him and made him mad; that except for such threat he would not have resigned; and that he did not want to sell his stock and would not have done so had it not been for such threat. But he did not testify that he became deeply moved or upset in mind; that he could not sleep; that his nerves were strained; that he could not think clearly; that he could not control himself; or that he could not exercise his own free will. He did not give any testimony of that nature. And there was no other direct evidence indicating such a condition of mind. Moreover, the testimony that the threat frightened him and made him mad had reference to the time of the conversation in the lobby of the hotel, and the stock was not sold then. The contracts for the sale of the stock were executed more than two weeks later, and the record is utterly bare of any direct evidence with respect to his being frightened or otherwise disturbed in mind at that time. Not only so, but his negotiations in Bitler's room immediately after the threat was made, his letter written three or four days thereafter in respect to getting the largest price possible for the stock, his trip to Kansas City three or four days later for the purpose of conferring with Bitler in particular with respect to securing the highest possible price, his negotiations

immediately preceding the execution of the contracts, his leaving the conference and having an attorney prepare the proposed contracts, his redrafting one of them in his own handwriting, and his subsequent correspondence with the company and with Reveley, all considered together, completely negate the suggestion that at the time of the execution of the contracts he was so frightened or distressed in mind as to overcome his judgment and prevent the exercise of his free will. The evidence failed to establish a prima facie case of duress under the law of Kansas. Western Paving Co. v. Sifers, supra; Jones v. Prickett, supra.

The judgment is affirmed.