MATTIE J. HEATON v. THE NORTON COUNTY STATE BANK, THOMAS BURTON AND W. T. SHOEMAKER.

**No. 10577.**

1. UNDUE INFLUENCE—*wife not bound by contract induced by threat of husband's imprisonment.* A wife is not bound by a contract induced solely by the threats of parties that in case she fails to enter into the contract they will cause the arrest and imprisonment of her husband.

2. ——— *whether lawfulness threatened of arrest material?* If it is ever material whether the threat is of lawful or unlawful imprisonment, it does not prevent the wife from making the defense of duress where the guilt of her husband has not been conceded or shown.

3. ——— *notary taking acknowledgment a competent witness of circumstances.* A notary public, who took the acknowledgment of the wife to the contract and instrument of conveyance alleged to have been obtained by duress and who acted as the agent of the parties exercising the duress, is a competent witness as to the acts, declarations and circumstances preceding and leading up to the executing of the papers by the wife.

Error from Norton District Court. A. C. T. Geiger, Judge. Opinion filed April 9, 1898. *Reversed.*

Mattie J. Heaton brought an action against the Norton County State Bank, Thomas Burton and W. T. Shoemaker to recover $9600, the alleged value of ninety-six shares of the capital stock of The Norton County State Bank, which, it is alleged, were unlawfully obtained and converted by the defendants.

The defendant Bank answered that the plaintiff was formerly a stockholder and director in the Bank, and that her husband, Morgan Heaton, was also a stockholder and the cashier and chief managing officer thereof; that on or about November 21, 1893, an action was commenced by certain stockholders, in the United States Circuit Court, in which it was claimed that the Bank was being wrecked by the fraud and mismanagement of Morgan Heaton and

that it had become insolvent; that a receiver was appointed, who took charge of the Bank and its assets, and that subsequently an arrangement was entered into by the stockholders for the settlement of that suit, the reorganization of the Bank, and the discharge of the receiver; that the general plan was that certain notes and obligations of the Heatons and others, owned by the Bank, and amounting to nearly twelve thousand dollars, should be delivered up to Morgan Heaton in consideration that he should transfer to Thomas Burton, the president of the Bank, the shares of stock held by him and by the plaintiff, his wife, and certain other persons who had been associated with them, and that this transfer included the ninety-six shares of stock to recover the value of which the present action was brought; that as evidence of said agreement the plaintiff and her husband, as well as the defendant Bank and its stockholders, executed a writing, dated January 10, 1894, and in pursuance of the agreement the promissory notes above mentioned, amounting to nearly twelve thousand dollars, were canceled and delivered to Morgan Heaton; that the plaintiff assigned in writing the shares of stock standing in her name, and that all the terms of the agreement were fully performed and carried out; and that as a part of the agreement the Heatons transferred a number of tracts of real estate, including their homestead.

Burton and Shoemaker filed separate answers, which were, in effect, general denials.

The plaintiff's reply alleged that the contract mentioned in the answer of the Bank, which purported to convey the property and transfer to the Bank the shares of stock in question, was wholly without consideration, and that no benefit or right whatever accrued to her by reason of its execution and delivery or of the assignment and surrender of the certificates

of stock ; that her signature to the contract and transfer was obtained by coercion, intimidation, duress and undue influence, practiced and brought about by the Bank and its officers and agents as well as by the defendants Burton and Shoemaker ; that the Bank, its officers and agents, as well as Burton and Shoemaker, prepared the written contract and the assignment of stock, and came to her home, after midnight, and fraudulently represented to her that M. Heaton, her husband, had stolen and embezzled the funds of the Bank while he was in charge of the same, and that if she did not execute the papers mentioned, the defendants would immediately cause her husband to be arrested and imprisoned on the charge of embezzlement and larceny ; that the defendants had previously threatened her husband with arrest and imprisonment, of which threat she had been notified, and that she then and there believed that the defendants would immediately cause the arrest and imprisonment of her husband unless she executed the paper and assigned and surrendered the stock ; that, being put in fear by these threats of arrest and imprisonment, she executed the contract and other papers and surrendered the shares of stock above mentioned ; that the execution of the papers and the delivery of the shares of stock were induced wholly by the threats which were made by the defendants for the purpose of intimidating her and cheating her out of her stock ; that she never authorized M. Heaton to sell, assign or surrender her certificates of stock to the defendants or to any of them, never consented to the reorganization of the Bank nor to any of the transactions embraced in the agreement which she was fraudulently induced to sign ; that a note of $3,800, mentioned in the answer of the defendants and signed by herself, was an accommodation note, upon which she was not liable to the

Bank, and that it had been fully paid by another person who had guaranteed its payment.

The cause was tried by the court without a jury, and in the course of the trial considerable testimony offered in behalf of the plaintiff was excluded by the court on the objection of the defendants. After the introduction of the evidence, the court found generally in favor of the defendants and rendered judgment accordingly.

*L. H. Wilder* and *Angevine & Cubbison*, for plaintiff in error.

*David Martin* and *L. H. Thompson*, for defendants in error.

JOHNSTON, J. The important issue in the case is the duress alleged to have been exercised by the defendants, causing the plaintiff to transfer the bank stock in question. That the plaintiff executed the contract and deed and assigned and delivered the bank stock, on January 10, 1894, is conceded. Negotiations for a settlement with the Heatons and for the reorganization of the Bank had been progressing for some time. On the night of the above-mentioned date, Burton, president of the Bank, Shoemaker, secretary and assistant cashier, and John C. Brown, a stockholder, met in the office of Brown, and, having secured the attendance of the attorney for the Bank, sent for Morgan Heaton and endeavored to induce him to settle with the Bank by transferring to it certain property and bank stock held by him, his wife, and others, for which certain notes and obligations of the Heatons were to be canceled and a small sum of money was to be paid to Heaton. Burton, Shoemaker and Brown appear to have been the principal actors in behalf of the Bank, and

they spent most of the previous day in preparing the papers which they desired the Heatons to execute. In response to a note, Morgan Heaton was brought to Brown's office between nine and ten o'clock at night, and the contract which had been prepared was presented to him. After reading it over, he objected to some of its terms ; a controversy ensued, in which the representatives of the Bank insisted that the Heatons should sign the papers and close up the transaction ; and Heaton, on the other hand, insisted on more favorable terms than were provided for in the contract. After wrangling for some time, and without effecting a settlement, Heaton left the office and started for home. Shortly afterward, Burton followed, and when he caught up with Heaton he told him that if he did not go back to the office and sign the contract and papers at once, and then go and get his wife to sign them, he would be arrested. Heaton then returned to the office, signed the contract, and the deed to the homestead, and then he and Brown, who was a notary public, started to Heaton's home to induce his wife, the plaintiff, to sign the papers.

Brown, who was called as a witness, was asked what occurred on the way to Heaton's home ; but an objection was made that, having taken the acknowledgment of her signature to the deed and contract, he could not testify to what occurred on that occasion, as it would tend to impeach his official action and his notarial certificate. This objection was sustained by the court.

The plaintiff then offered to prove by the witness : "That on the night of the ninth of January, 1894, at at about two or three o'clock in the morning of that night — the morning of the tenth — this witness and the defendant M. Heaton started, under the direction

and at the request of the officers of the Norton County State Bank, to go to the residence of the plaintiff in this case, Mattie J. Heaton, for the purpose of procuring the signature of the plaintiff, Mattie J. Heaton, to the deed and contract referred to in the answer of defendant herein, and to obtain from her an indorsement and delivery of her certificates of stock set up in the petition herein; that they met Mrs. Heaton on the street of the city of Norton, between two and three o'clock in the morning; that Mrs. Heaton then said: 'Is that you, Morgan?' — meaning her husband, and he (Heaton) answered: 'Yes'; that she then went up to the witness and Mr. Heaton and asked: 'What is the reason that you are out at this time of night? What business have you people on hand that you cannot transact in the daytime?' That Mr. Heaton then said to her: 'They have held me up for all we have except the children, and you might as well go back to the house and sign your death warrant. Mr. Burton told me that, if we do not immediately execute deeds conveying our homestead and our other real estate, and transfer all of our bank stock to him, so that he can get away on the early morning train in the morning, he will have me arrested and imprisoned for the crime of embezzlement.' That Mrs. Heaton then asked the question: 'Has any criminal prosecution been commenced?' That the witness said to Mrs. Heaton, in answer thereto: 'We are trying to fix this matter up and avoid a criminal prosecution.' That she then asked the witness whether or not they could convict her husband, M. Heaton, and the witness replied: 'I do not know. We are trying to fix it up and avoid a prosecution.' That they then went to the house, and Mrs. Heaton again asked the witness: 'Can Morgan,' meaning her husband, 'be convicted?' That the

witness said : 'Mrs. Heaton, that I do not know.' That then Mrs. Heaton asked the witness what papers there were to be signed, and the witness told her a contract and a deed, and they wanted the bank stock assigned, also the certificates of school land, 'which I did not have. I did not have the bank stock nor the school land certificates.' She said that she would not give up her bank stock. 'Well' I (witness) says, 'Mrs. Heaton, I am not up here to hold a club over you, or to get or to induce you to sign these papers against your will, and if you are not going to sign them I had just as well go.' While they were standing in the street, and again while they were at the house, before Mrs. Heaton signed any of the papers or delivered them to the witness, Mr. Heaton stated to Mrs. Heaton that Mr. Burton, the president of the bank, had said to him (Heaton) that unless the papers were signed so that he could have them to go on the morning train down to Dan Heaton's, he would have him (Morgan Heaton) arrested in the morning as soon as he could get the papers out.'' Upon objection, this testimony was also excluded.

Brown stated that more than an hour elapsed after meeting Mrs. Heaton in the street before she consented to sign the papers and transfer her stock. The plaintiff offered to prove by the same witness that when she signed the contract and transferred her stock she was very much agitated and excited, and further, that she refused to transfer her bank stock until after she had been told that Burton said that if she did not sign the papers and deliver the bank stock so that he could get away on the early morning train, he would have Heaton arrested and imprisoned for embezzlement. These offers were both rejected, upon the ground that the testimony offered would tend to impeach the integrity of the official action of the notary.

In support of the rulings, it is assumed that the proposed testimony would have impeached the certificate of the notary, and it is contended that he was not a competent witness to contradict or falsify the statements in his certificate. As sustaining this contention, reference is made to the following cases: *Central Bank v. Copeland,* 18 Md. 305; *Stone v. Montgomery,* 35 Miss. 83; *Shapleigh v. Hull,* 41 Pac. 1108; *Harkins v. Forsyth,* 11 Leigh, 294. The plaintiff contends that the ruling is against sound reason and not required by public policy, and is opposed by the great weight of authority, and cites the following cases: *Lee v. Ryder,* 1 Kan. App. 293, 41 Pac. 221; *Mays v. Pryce,* 95 Mo. 603; *Pickens v. Knisely,* 29 W. Va. 1; *Tatman v. Goforth,* 9 Iowa 247; *Pereau v. Frederock,* 17 Neb. 117; *Camp v. Carpenter,* 52 Mich. 375; *Garth v. Fort,* 15 Lea 683; *Truman v. Lore,* 14 Ohio St. 144; *Stevenson v. Brasher,* 90 Ky. 23: *Moore v. Hopkins,* 83 Cal. 270.

On behalf of the plaintiff, it is said that some of the cases cited by defendants proceed upon the theory that the act of the notary is judicial, and that his act and certificate carry with them the verity of a judicial proceeding. Attention is called to the fact that our statute differs from that of other states, in not requiring that a married woman shall be examined separate and apart from her husband and in not requiring that the certificate shall state that it was her voluntary act and deed. The only facts required to be stated are that the person making the acknowledgment was personally known to the officer to be the same person who executed the instrument, and that such person duly acknowledged the execution of the same. Gen. Stat. 1897, ch. 117, § 12. Attention is also called to the fact that, in Kansas, the acknowledging officer does not act in a judicial capacity, and that his certifi-

cate does not have the conclusive effect that it does in states where his acts are regarded as judicial verities. In Kansas, the certificate of acknowledgment is only *prima facie* evidence of the execution of the deed, and all mistakes made by the officer in taking the acknowledgment may be explained and corrected by proper proof as readily as mistakes of any other ministerial officer. *Wilkins v. Moore*, 20 Kan. 538; *Heil v. Redden*, 45 id. 562, 26 Pac. 2. While the acknowledgment is necessary to entitle the conveyance to be entered of record, and thus impart constructive notice, it is not essential to the validity of the instrument. The execution may be proved by proper testimony, and when proved, "it is then immaterial whether the deed was acknowledged or not, and such unacknowledged deed passes title equally with one duly acknowledged." *Mo. Pac. Rly. Co. v. Houseman*, 41 Kan. 300, 21 Pac. 284.

Wherever these considerations may lead, and wherever the reason and weight of authority may be, the point contended for by the defendants is hardly presented by the facts in the record, and its determination is not required.

3. Notary a competent witness, when.

The proof offered did not, in our view, contradict or impeach the certificate. That the plaintiff signed the papers and acknowledged the signing of the same, was never a matter of dispute between the parties. The facts about which inquiry was made related to the undue influence and duress exercised by the defendants; and the declarations and acts leading up to, and prior to, the execution of the conveyance, were admissible, in our view of the case. The answers to the questions would not necessarily have falsified any fact which the notary was required under our statute to state in his certificate; and therefore we are clear that he was a competent witness, and

19—59 KAN.

that his testimony, which was very important on the issue presented, should have been received. *Bird v. Logan*, 35 Kan. 228, 10 Pac. 564.

When the plaintiff became a witness in her own behalf, an inquiry was made as to the representations made by Brown with reference to the commencement of criminal prosecution against her husband. She had previously stated that, becoming alarmed at the long absence of her husband, she had started out to find him, about one o'clock at night, and found Mr. Brown and her husband on their way to the Heaton home. The inquiry referred to the representations made by Brown to her on the street as to the threatened prosecution and arrest of her husband. The defendants objected to her testimony upon the ground that " the person against whom redress is sought may be a party to the act of duress "; and this objection was sustained. The same objection was made when she was asked to give the conversation that occurred between her and Mr. Brown, on that night, preceding the signing of the papers, and it was also sustained. The plaintiff then made an offer to prove by the witness that, at the time and place mentioned, Mr. Brown stated to her that he had some papers, which he wished her to sign, conveying property to the bank, including a conveyance of her homestead, a contract, and also a transfer of her certificates of stock; that she then inquired of Brown whether criminal prosecution had been commenced against her husband, and Brown answered: "No, we are trying to fix this matter up to avoid criminal prosecution, and that is why I want you to sign these papers." She then inquired what the charge against her husband was, and Brown answered: "A charge of embezzlement, misappropriating the funds of the Bank, and speculating on the

board of trade." She inquired if they could prove the charges against her husband, and Brown said: "I do not know; but if they can prove what they say they can, they can convict him; and they say they can prove it." This offer was excluded by the court. The offer was renewed in different forms, but all was excluded, except the mere fact that Brown requested her to sign the papers. Among other things, she offered to prove that, when she asked Brown if her husband should be arrested on the charge made what the consequences would be, he told her that it would be imprisonment in the penitentiary; further, that Brown told her that Burton, the president of the Bank, had stated to Heaton that this would be the last chance of settling the matter without a criminal prosecution. She was not even permitted to state that when she signed the papers and transferred her bank stock she believed that if she did not do so her husband would be arrested and imprisoned in the morning. When she offered to prove that she was the owner of the bank stock, that it was of the value alleged in her petition, that she received no consideration for the transfer of the same, and that there was no liability against her on the $3,800 note, she was met with the objection that such evidence could not be received until duress had been established; and this objection the court sustained. Most of the testimony which she attempted to offer to establish duress had been excluded by the court, as we have seen; and, later, when she offered to prove that at the time of the signing of the papers and the transfer of the stock she was under great mental excitement because of the threats of prosecution, arrest and imprisonment of her husband, which threats were made by the president of the Bank and were communicated to her by Brown, and that but for these threats and the fear and duress thereby caused

she never would have transferred the stock, the offer was rejected.

We think most of the testimony mentioned was admissible, and that error was committed in excluding it. The contract and transfer by the plaintiff are without validity, if they were obtained against her will; and there was no volition of free agency, if the signing of the papers and transfer of the property were induced solely by the threats made to her by the defendants that in case she failed to execute and transfer they would cause the arrest and imprisonment of her husband. *Bank v. Croco,* 46 Kan. 620, 26 Pac. 939; *Thompson v. Niggley,* 53 id. 664, 35 Pac. 290; *Adams v. Bank,* 116 N. Y. 606; *Springfield Ins. Co. v. Hull,* 37 N. E. Rep. 1116; *Miller v. Lumber Co.,* 98 Mich. 163; *Morse v. Woodworth,* 155 Mass. 233.

*1. Wife not bound by contract induced by threats.*

The evidence offered tended to show that the will of the plaintiff was overcome, that she was deprived of free agency because of the threats made by the defendants, and that they were purposely made and communicated to obtain the execution of the papers and the transfer of the property by the plaintiff. The testimony received and offered tended to show that Brown acted as the agent of the Bank in procuring her signature and the surrender of her property. He was a stockholder in the Bank, was an active participant in the settlement, assisted in the preparation of the papers that were finally signed, and stated that he went to the house in the night-time to procure her signature in behalf of the Bank and at the request of Burton, the president. According to the testimony, he did more than merely to request her signature, for it appears that he spent more than an hour in endeavoring to induce her to sign the papers and transfer her stock. If the offered testimony is true, he com--

municated to her the threats previously made by the defendants, and informed her that her failure to accede to their demand would result in the prosecution and imprisonment of her husband.

In behalf of the defendants it is said that there is no duress unless the imprisonment is unlawful, and that, as Heaton was guilty of an offense, and liable to arrest and imprisonment, there could be no duress in this instance.

2. Lawfulness of
imprisonment
no defense.

The guilt of Heaton was not admitted, and not a syllable of testimony was offered tending to show he was actually guilty. His guilt cannot be assumed because it is charged by the defendants, nor because the plaintiff yielded to her fears when the defendants threatened the institution of criminal proceedings against her husband. If an information had been filed, charging him with an offense, he would have been entitled to the presumption of innocence, at least until a conviction was obtained ; and surely his guilt cannot be presumed, without proof, in a civil action.

It has never been directly decided in this court whether a threat of prosecution for an offense of which the party charged was actually guilty constituted duress, although it was held in *Thompson v. Niggley*, 53 Kan. 664, that a note and mortgage extorted by threats of prosecution for an offense of which the party threatened was guilty in fact, but which was in no way connected with the demand for which compensation was sought, may be avoided by the party executing them. When the will of a party is overcome by threats and there is no free will or agency in making the contract, it is not easy to find room for a distinction between a case where the imprisonment threatened is lawful and one where it is unlawful.

Imprisonment may be lawful so far as the public or those representing the public are concerned, but is it ever lawful for a party to force the signing of a contract, the surrender of property, or the obtaining of some other private advantage, against the will of another, by using or threatening to use the machinery of the law intended for the protection of the public and the punishment of criminals?

In addition to the authorities mentioned in *Thompson v. Niggley*, supra, there are many cases holding that, where there are threats, compulsion, and undue influence, there is no volition; and it is of no consequence whether the threat is of lawful or unlawful imprisonment, and in a late case decided by the Supreme Court of Massachusetts it was held that, while there was a division of opinion on the question, the view mentioned "rests on sound principle and is in conformity with most of the recent decisions in such cases both in England and America." *Morse v. Woodworth*, 155 Mass. 233. See cases there cited.

Whatever may be the rule, the nature of the imprisonment threatened is not shown. The guilt of Heaton was not conceded nor established by proof, and we cannot presume that he is a felon. Therefore the point that the imprisoment threatened was lawful does not arise, and if the contention of the defendants is correct, it was no reason for excluding the testimony offered in behalf of the plaintiff.

For the errors mentioned the judgment of the District Court will be reversed and the cause remanded for another trial.