No. 35,450

MOTOR EQUIPMENT COMPANY, *Plaintiff,* v. L. R. MCLAUGHLIN and NORA MCLAUGHLIN, *Appellees;* THE INTERSTATE SECURITIES COMPANY, *Appellant.*

(133 P. 2d 149)

Opinion filed January 23, 1943.

*L. M. Kagey,* of Wichita, and *Harry B. Jenkins,* of Kansas City, Mo., argued the cause for thé appellant.

*Roy H. Wasson* and *Vincent F. Hiebsch,* both of Wichita, argued the cause, and *William J. Wertz* and *Milton Zacharias,* both of Wichita, were on the briefs for the appellees.

The opinion of the court was delivered by

WEDELL, J.: This was originally an action by the Motor Equipment Company against the defendant, L. R. McLaughlin, to recover a money judgment for merchandise sold to him as an operator of a Ford Motor Agency and garage at Valley Center, near the city of Wichita. The Interstate Securities Company, a corporation, was joined as a party defendant for reasons which will appear from the pleadings.

The action expanded into cross actions for damages between the defendants. The defendant, McLaughlin, prevailed, and the other defendant appeals. The original plaintiff is not a party to the appeal.

It will serve no useful purpose to narrate the detailed allegations of the voluminous pleadings. We shall narrate only such portions thereof as are necessary to disclose the general nature of the actions. Further additional facts will be developed under the contentions of the parties. For brevity we shall refer to the Interstate Securities Company, a corporation, as the Interstate or as the appellant. The petition of the plaintiff, Motor Equipment Company, in substance alleged:

It had sold to McLaughlin merchandise of the value of $200.60, payment therefor had been demanded and refused; on the 21st day of February, 1938, McLaughlin executed and delivered to the Interstate a series of chattel mortgages whereby he mortgaged and conveyed all of his fixtures, supply parts and automobiles to the Interstate; on the second day of March, 1938, the latter took possession of all of said chattels, loaded them into trucks, hauled them away, and the McLaughlin Motor Company immediately ceased to function; the value of the property sold and moved was in excess of $3,000; the Interstate had not notified plaintiff of its mortgages or that it had taken possession of McLaughlin's chattels thereunder; the taking of such property violated the bulk-sales law; the Interstate had sold some of the property; if McLaughlin did not pay his debt to plaintiff, the Interstate should be held liable therefor.

On June 18, 1938, the Interstate filed its answer and cross petition. The answer in substance alleged: On or about February 21, 1938, and prior thereto, it had financed much of McLaughlin's business; it had purchased notes and mortgages executed by alleged purchasers of cars from McLaughlin; there were seventeen deals for a total sum of $7,046.97; on February 21, 1938, the Interstate discovered the mortgages had been forged by McLaughlin and McLaughlin admitted he was indebted to the Interstate therefor; being fearful of further loss, the Interstate took possession of all of the assets of the McLaughlin Motor Company, including the open accounts; the property was removed to its office at Wichita; it obtained from McLaughlin a list of his creditors; at the time it took the property it received from McLaughlin an assignment of all accounts; it had sold property to the value of $1,140; it took such property and assignment for the benefit and protection of itself and other creditors.

The cross petition of the Interstate in substance alleged: The Interstate had been sued by one creditor of McLaughlin and probably would be by others; the funds in its hands should be held for

the benefit of all creditors of McLaughlin and for the payment of the accounts of all creditors; it prayed that all creditors be made parties to the action; that it be authorized to proceed with the liquidation of the remaining assets, that the court appoint a receiver to take charge of the property and that if the proceeds from the sale of the assets were insufficient to pay the claims of the creditors that then each of them have judgment against McLaughlin for the balance due them.

On February 28, 1940, McLaughlin filed his answer to the cross petition of the Interstate and a cross petition for damages against the Interstate. His answer, in addition to a general denial of the averments contained in the answer and cross petition of the Interstate, in substance alleged: he was entitled to a credit on a reserve fund held by the Interstate in the sum of $1,500; many articles were taken by the Interstate from his place of business on March 2, 1938, in addition to those listed in the answer and cross petition of the Interstate; the Interstate had asked for no list of his creditors and had obtained none; the Interstate had not used its best efforts to obtain the highest value of articles it had taken and sold; all property taken by the Interstate was taken by it for the purpose of defrauding his creditors; all mortgages or assignments which the Interstate had obtained from him were obtained as a result of statements and threats that if he did not execute them he would be sent to the penitentiary; he believed the threats and believed he would be prosecuted and, therefore, signed the instruments; the instruments had no validity.

The cross petition of McLaughlin in substance alleged: he was the owner of the various automobiles and property taken by the Interstate, a list of which was attached to his cross petition; all of said property was willfully, maliciously and oppressively taken from his place of business by the Interstate on March 2, 1938, and possession thereof was obtained by removing the same over his protests and by physical force; his place of business was completely ransacked and his business ruined; the automobiles, fixtures, parts and accessories so wrongfully taken were worth $15,000; he prayed for actual damages in that amount, also for punitive damages in the sum of $15,000.

On July 18, 1940, the Interstate filed an amended answer and cross petition in which it sought to recover from McLaughlin the sum of $7,046.97, minus a certain credit, together with interest thereon from the 21st day of February, 1938. This amount was

sought to be recovered from McLaughlin on the theory it had been obtained by McLaughlin under false and fraudulent representations in connection with the process of financing his purchase and sale of cars.

To this amended cross petition McLaughlin filed a demurrer upon several grounds, one of which was that the action of the Interstate for damages was barred by G. S. 1935, 60-306 (third), more than two years having expired since its cause of action, predicated on fraud, had accrued. The demurrer was sustained as to affirmative relief in favor of the Interstate but was overruled as to any setoff the Interstate might establish to any judgment for damages which McLaughlin might recover against it. The Interstate was given time within which to plead further if it desired. It amended its cross petition and prayer to conform to the ruling and asked only for a setoff against any claim for damages which McLaughlin might recover.

The reply of McLaughlin put in issue all of the allegations contained in the answer and cross petition of the Interstate.

The trial court overruled the demurrer of the Interstate to the opening statement of McLaughlin and also overruled its demurrer to the evidence of McLaughlin. The ground of the demurrer was that McLaughlin had not established a cause of action against it. The Interstate introduced evidence in support of its claim for damages. The jury returned a verdict in favor of McLaughlin for both actual and punitive damages. In its special findings it allowed the Interstate a setoff.

Appellant's complaints are argued under twelve separate headings. We shall treat the contentions in the order in which they arose in the course of the trial.

Appellant argues the trial court erred in sustaining appellee's demurrer to its amended cross petition for damages. That petition sounded in tort. It was filed Feburary 28, 1940. The alleged fraud upon which it was based was discovered by appellant on February 21, 1938, when appellee voluntarily and in substance advised appellant the mortgages upon which he had received the money from it were fictitious. The original answer and cross petition of appellant, previously described, was filed June 18, 1938. In that petition appellant sought to have its account for the same amount of money allowed against McLaughlin. The theory of the original petition was that the relation of debtor and creditor existed between

it and appellee. According to the allegations of appellant's amended petition it discovered the fraud on February 21, 1938, and under its amended petition it sought judgment against appellee for such fraudulent acts together with interest thereon from February 21, 1938. It appears this latter action, which sounded in tort, was barred as to affirmative relief and that the ruling on the demurrer was proper. We need, however, not pursue that subject. Appellant was given leave to amend its amended petition. It acquiesced in the ruling on the demurrer and amended its amended petition by striking therefrom the allegation that due demand had been made for payment and by also amending the prayer to conform to the ruling. It asked only for a setoff against any amount which appellee might recover against it for damages. Furthermore, as will later appear, the jury, in a special finding, allowed appellant the full amount it claimed to have been damaged by virtue of the fictitious instruments. Manifestly, appellant did not complain concerning that finding. Under the circumstances no reversible error, if any error, was committed by the ruling on the demurrer and appellant is in no position to complain concerning it.

Appellant contends the court erred in overruling its demurrer to the opening statement of appellee and its demurrer to the evidence of appellee. It argues these two points together. The theories of the contentions are the same. It insists appellee's action for damages was barred within two years. Appellee's action was filed February 28, 1940, which was within two years from March 2, 1938, the date on which appellant removed the property from appellee's place of business. In the trial appellant contended it was placed in charge and control of appellee's business by appellee on February 21, 1938, and that on the same date it took possession of all property which it removed on March 2, 1938. The evidence on that point was sharply conflicting. The jury resolved the conflict against appellant and specifically found appellant took charge of the property on March 2. Appellant argues the instruments complained of as having been obtained by duress were only those executed on February 21, 1938, and that appellee, not having them canceled and set aside, was bound thereby after two years from February 21, 1938. Appellant, however, concedes its contention is based upon the theory no duress in obtaining those instruments was established. Whether the instruments executed on February 21, 1938, were obtained by duress was a question of fact to be deter-

mined by the jury under proper instructions on that subject. Appellee testified that by reason of threats of sending him to the penitentiary if he did not sign them, he executed whatever instruments appellant placed before him and that he was in constant fear of such threats until two years had expired and a prosecution was barred. The statute of limitations does not commence to run against an action for relief on the ground of duress by threats while the mind of the aggrieved party continues to be dominated by such threats. (*Bank v. Bay*, 90 Kan. 506, 135 Pac. 584; *American Nat'l Bank v. Lipe*, 123 Kan. 674, 679; 37 C. J., Limitations of Actions, p. 949, § 321; 34 Am. Jur., Limitation of Actions, § 236; Anno., 121 A. L. R., p. 1294.)

We pause to note that the instruments executed on February 21, 1938, were not the only instruments which appellee claimed he had signed under the same threats. There were also instruments which he claimed to have executed under the same duress on the afternoon of March 2, 1938. On their face they gave appellant the right to take immediate possession of not only numerous automobiles but also all open accounts receivable and notes collectible which pertained to the automobiles described therein. Appellee had been called to appellant's office in Wichita to sign those instruments on March 2, and before he returned to his place of business at Valley Center, appellant had already loaded much of the equipment, accessories and parts into trucks. Even on the theory of ordinary fraud appellee's action filed on February 28, 1940, was therefore in time as to the last instruments. Since, however, appellee's cause of action did not accrue until such time as the duress ceased to exist, we need not distinguish between instruments which were signed on February 21 and March 2, 1938.

Appellant contends appellee knew he had violated the criminal law and was subject to a lawful prosecution. Appellant contends it does not constitute duress to threaten a lawful prosecution. That statement, standing alone, may be conceded, but is that all appellant did? According to appellee's testimony appellant threatened to send him to the penitentiary if he did not sign the instruments in question. According to appellee's testimony the threats were effective and resulted in precisely what they were designed to accomplish, namely, the obtaining of a benefit by appellant. Appellee testified he signed whatever appellant placed before him, and that by reason of the threats, which he believed, he was afraid to do

otherwise. Tested by demurrer those facts were admitted as true. Criminal laws are designed for the protection of society and are not intended to be used for the collection of debts. (*Williamson v. Ackerman*, 77 Kan. 502, 506, 94 Pac. 807; *Western Paving Co. v. Sifers*, 126 Kan. 460, 464, 268 Pac. 803.)

In *Williamson v. Ackerman*, supra, we said:

"If it be assumed that John misappropriated the money of the plaintiff, and was therefore indebted to it for a large sum of money, nevertheless plaintiff's representatives had no right to use, or threaten the use of, the criminal law to make the father pay or secure the debt. Such a method is not an appropriate one for enforcing the payment of a debt *by the debtor himself,* much less to compel the securing of it by one who was in no sense liable for its payment." (p. 506.) (Emphasis supplied.)

In our early case of *Heaton v. Bank,* 59 Kan. 281, 52 Pac. 876, we asked:

"When the will of a party is overcome by threats and there is no free will or agency in making the contract, it is not easy to find room for a distinction between a case where the imprisonment threatened is lawful and one where it is unlawful. Imprisonment may be lawful so far as the public or those representing the public are concerned, but is it ever lawful for a party to force the signing of a contract, the surrender of property, or the obtaining of some other private advantage, against the will of another, by using or threatening to use the machinery of the law intended for the protection of the public and the punishment of criminals?" (p. 293.)

The query was answered in the negative.

In *Western Paving Co. v. Sifers,* 126 Kan. 460, 268 Pac. 803, stressed by appellant, the court stated the views of various courts and said:

"The adherents to each view regard their own as supported by the better reasoning and the weight of authority. This court is committed to the doctrine that in negotiations for settlement of the claim of a person injured by the wrongful conduct of another, it is not duress for the injured person to threaten to use the law to its full extent against the other. (*Riney v. Doll,* 116 Kan. 26, 225 Pac. 1059, and cases cited on page 32 of the opinion.) Logically, it would follow that if the wrongful conduct should include violation of the criminal law, it would not constitute duress to threaten the wrongdoer with criminal prosecution; but the court has not so declared, and it is not necessary to determine the matter now." (p. 465.)

In the *Riney* case, cited in the preceding quotation, we definitely emphasized the fact that the threat there made was not equivalent to a threat of criminal prosecution but was only equivalent to saying he (Riney) would use whatever provisions of the law were avail-

able to protect his rights. The threat of criminal prosecution was not one of the provisions of law available for the collection of his claim for damages and the court, as the opinion in the Riney case clearly discloses, refused to declare such a threat was available for the enforcement of private rights.

Although the authorities even now remain somewhat divided, we think the better reasoned cases and the modern rule is that although the state might successfully prosecute a person for the commission of an unlawful act, such fact does not destroy the coercive character and compelling force of threats of imprisonment which result in the threatener obtaining an advantage. (Restatement, Contracts, § 493; 17 Am. Jur., Duress and Undue Influence, § 13; 17 C. J. S., Contracts, Old and Modern Doctrine, §§ 174, 175.)

The important question in cases of this character is not whether there was ground for the threatened arrest or imprisonment but whether the party threatened was, by such threats, deprived of the exercise of his free will. (*National Bank v. Croco,* 46 Kan. 620, 26 Pac. 939; *Williamson v. Ackerman,* supra, p. 508; *Smith v. Bank,* 90 Kan. 299, 133 Pac. 428; *Riney v. Doll,* 116 Kan. 26, 225 Pac. 1059; *American Nat'l Bank v. Lipe,* 123 Kan. 674, 256 Pac. 967; *Jones v. Prickett,* 135 Kan. 640, 11 P. 2d 1008; 17 Am. Jur., Duress and Undue Influence, p. 873, § 2.)

Did the threats in the instant case result in depriving appellee of the free exercise of his will? While that is always a question for the determination of the jury, we have said the evidence to establish duress must be substantial—not merely some evidence—and that the court is not obliged to submit to the jury evidence which does not measure up to the required standard of proof. (*Western Paving Co. v. Sifers,* supra, p. 464, and *Jones v. Prickett,* 135 Kan. 640, 644, 11 P. 2d 1008.) In the Sifers case duress was defined as follows:

"To constitute duress by threats the actor's manifestation must be made for the purpose of coercing the other; must have for its object the securing of undue advantage with respect to the other; must be of such a character that it is adapted to overpower the will of the other and is reasonably adequate for the purpose; must in fact deprive the other of free exercise of will; and must cause the other to act to his detriment." (p. 463.)

In determining whether the evidence of duress was substantial it was, of course, necessary to take into consideration all the facts and circumstances together with reasonable inferences which properly might be drawn therefrom. For the purpose of testing that

evidence on demurrer, the trial court was required to consider only the evidence favorable to appellee. That evidence in substance disclosed: when appellee, on February 21, 1938, went to the office of appellant at Wichita, he went there for the purpose of voluntarily disclosing to appellant that certain mortgages, or at least part of them, which he had formerly delivered to it and under which he had obtained somewhat over $7,000, were fictitious, and to tell appellant he would sell his business and pay the obligation; when he went to make such disclosure he did not contemplate signing demand notes and mortgages which would enable appellant to take possession of all of his business property on demand and completely wreck his automobile and garage business; the building in which he operated was approximately 130 feet long and 50 feet wide; prior to February 21, 1938, he had at least twenty cars and only eleven or thirteen of them were mortgaged; he had parts and accessories of various kinds, machinery and garage equipment, thirteen steel bins, and considerable office furniture and equipment; these articles, exclusive of the automobiles and office furniture and equipment, were worth $5,227.05 (the jury allowed appellee $5,-720 for cars taken by the appellant and that matter will be discussed under a subsequent contention); he had $3,000 worth of good open accounts and about $1,000 worth of slow accounts, all of which were unencumbered; he had $1,000 worth of good notes and $1,000 or $1,500 worth of notes which were not so good; he had several offers to buy the place, and his banker, Mr. Basore, had a prospect or two on which he was then working; he first talked to a Mr. Streeter in appellant's office, he told him of the wrong he had committed and advised him that if appellant would give him a little time he could sell his business and shop equipment and realize an amply sufficient amount to pay appellant and a few other small creditors and have a balance left; Mr. Baugh, the manager, was brought into the conference. He was advised as Mr. Streeter had been advised; Mr. Baugh promptly stated:

"Well, it is our business loaning money; it is also our business collecting money, and you are going to give a mortgage on the place or sign this here or I am going to send you to the penitentiary, and it is that or else."

Baugh also said: "I had committed a crime and it would be no trouble for him to send me to the penitentiary"; appellee surely believed appellant would execute his threats; appellee did not believe he would have signed the instruments except for the threats; the same threats were made by Mr. Baugh when appellee executed

the assignments on March 2; he signed whatever they placed before him and, by reason of the threats, was afraid to do otherwise; according to appellant's statements to him it was a question of signing or going to the penitentiary; that was the reason he signed; appellee again advised Mr. Baugh, on March 2, that he had had some prospective purchasers and believed he could sell the place but Baugh renewed the threats and he signed the papers; he had been called by telephone by appellant on March 2 to come to its office in Wichita and after he signed the papers on that day and before he could return to Valley Center, a crew of approximately twelve men were already removing his automobiles and loading the equipment; they took everything, including his book accounts and notes, the papers in his safe and his office furniture and equipment.

J. Roderick Mayall, an attorney and a witness for appellee, in substance testified: he told Mr. Baugh on March 2 that the mortgages under which they were attempting to take the property had been obtained by duress and the taking violated the bulk-sales law. A Mr. Basore, appellee's banker, also asked Baugh to leave the property there until a prospective purchaser could see it the following morning; Mr. Baugh insisted upon removing the property and ordered his men to proceed; he (Mayall) closed the door and locked it; he was shoved out of the way and the door was unlocked; the sheriff was called, but it was too late; Mr. Dailey, an employee of appellant, on one occasion stated "he didn't understand why Mrs. McLaughlin wouldn't pay them to keep McLaughlin from going to the penitentiary."

In view of all the circumstances we think the evidence of duress was sufficiently substantial to warrant the submission of that question to the jury. In addition to cases previously cited, see, also, *Ogle v. Freeman,* 150 Kan. 864, 868, 96 P. 2d 670.

Appellant also argues that if the mortgages were obtained by duress appellee was estopped from relying thereon because he ratified the instruments alleged to have been so obtained. The contention is based upon the argument appellant was in possession and control of appellee's business between February 21 and March 2, 1938; that appellee permitted appellant to help him sell cars between those dates, and by the fact he gave appellant the proceeds from the sale of one car on March 3, and delivered one automobile to appellant on March 5. It is true these acts were performed in apparent recognition of the instruments claimed to have been obtained by duress.

These acts, according to appellee's testimony, were, however, all performed during the period the duress continued to exist and operate. In *American Nat'l Bank v. Lipe*, 123 Kan. 674, 256 Pac. 967, we said:

"And this court has held that there is a presumption that as long as duress endures conduct in apparent recognition of contracts made under such circumstances does not constitute ratification. (*Smith v. Bank*, 90 Kan. 299, 133 Pac. 428; *Bank v. Bay*, 90 Kan. 506, 135 Pac. 684; *Riney v. Doll*, 116 Kan. 26, 225 Pac. 1059; Anno. Duress, Ratification, 35 A. L. R. 866 *et seq.*, 9 C. J. 1205.)" (p. 679.)

Appellant also relies upon its right to take certain automobiles under the terms of chattel mortgages executed by appellee prior to February 21, 1938, concerning which no duress was claimed. It has been most difficult, if not impossible, to ascertain from the record before us what particular mortgages executed prior to February 21, 1938, were introduced as a part of the examination of appellee. They were the only mortgages which could be considered on a demurrer to the evidence of appellee. In any event it appears that whatever mortgages were introduced as a part of appellee's direct or cross examination or later as testimony of appellant, the question still remains whether appellant had a right to take the automobiles or any other property described therein, by force. There was positive testimony the property was taken from appellee's place of business on March 2, 1938, over the protest of appellee and by force. Appellee's attorney was pushed aside after he had protested to the removal of the property and had closed the door. The door was reopened and the property was removed by a large crew of appellant's men. The sheriff was called, but apparently too late. Appellant denied the employment of force, but whether force was employed was a question for the determination of the jury.

It is true the various chattel mortgages, among other things, contained a provision to the effect that if the mortgagee at any time deemed itself insecure, it was authorized and empowered to enter the premises of the mortgagor, or other place where the property might be, and take possession thereof without notice or demand. It is true this court is committed to the doctrine that under such mortgages it is immaterial whether the mortgagee had good cause to believe himself insecure, if in fact he deems himself insecure. (*Thorp v. Fleming*, 78 Kan. 237, 96 Pac. 470; *Weldgrube v. Kerns*, 111 Kan 428, 207 Pac. 654.) But was appellant, therefore, authorized to take and remove the property from appellee's place of

business by actual force? We think he was not. While the specific point does not appear to have been expressly decided in this state, the general rule forbids the taking of mortgaged property in such a manner. In 14 C. J. S., Chattel Mortgages, section 185, it is said:

"As a general rule, the only restriction on the mode by which the mortgagee shall secure possession of the mortgaged property after breach of condition is that he must act in an orderly manner and without creating a breach of the peace. The mortgagee must not take possession by the use of force, threats, or violence, nor, it has been held, by the use of fraud or stealth, and if he is guilty of trespass in regaining possession he must respond in damages to the mortgagor. If no breach of the peace is involved the mortgagee may enter the mortgagor's premises and take the property, but he is not permitted to break and enter, or to exclude the mortgagor from the premises." (p. 794.)

To the same effect is the statement in 10 Am. Jur., Chattel Mortgages, section 152. See, also, *Wilson Motor Co. v. Dunn,* 129 Okla. 211, 264 Pac. 194; *See v. Automobile Discount Corp.,* 330 Mo. 906, 50 S. W. 2d 933; *Baer v. Colonial Finance Co.,* 42 Ohio App. 482, 182 N. E. 521; *Runnels Chevrolet Co. v. Clifton,* Tex. Civ. App., 46 S. W. 2d 426.

Appellant contends a contrary rule was announced by this court in *Kaufman v. Kansas Power & Light Co.,* 144 Kan. 283, 58 P. 2d 1055. The contention is not good. That was an action for damages for assault. There was no charge the defendants, or any of its agents, servants, or employees was guilty of trespass, or with disturbing the peace. In the opinion it was expressly stated we could not, in that case, determine the right of the defendant company to send its men into the house to repossess the refrigerator, the property in question. (p. 288.)

Appellant also contends it had the right to take possession of mortgaged property under the provisions of G. S. 1935, 58-307, which provides that in the absence of stipulations to the contrary the mortgagee of personal property shall have the legal title thereto, and the right of possession. Manifestly, the statute does not pertain to a mortgage obtained by duress and if the mortgage was not so obtained the statute does not provide that when the right to take possession is resisted by the mortgagor, the mortgagee may take the law into his own hands and enforce his claim by a breach of the peace. Moreover, in the instant case appellee's office furniture and equipment were also taken. On it appellant at no time had a mortgage, obtained by duress or otherwise.

Appellant stresses the particular terms of a chattel mortgage, executed February 5, 1938, upon a certain car which authorized it to enter upon the premises where the property might be found without liability for trespass *in so entering,* and to remove and sell the same. Appellee does not contend appellant had no right to merely enter the premises. Such right appellant was at no time denied. But the mortgage provision did not authorize the removal of the property by force after appellant had entered the premises. Moreover, appellant requested no special or fuller instruction with respect to that particular mortgage or any other mortgage. In the instruction it requested it included only the provision pertaining to its alleged right to repossess property whenever it deemed itself insecure. A full instruction on that point was properly given. The belated complaint, if it ever had any merit, which we think it did not, is without force now.

The jury returned the following general and special verdicts:

"We, the jury, impaneled and sworn in the above-entitled case, do upon our oaths find for L. R. McLaughlin and against the Interstate Securities Company and assess the amount of recovery at $10,435.85 actual damages; $8,000 punitive damages. J. H. CONGDON, *Foreman.*"

"Special questions: 1. If you find for McLaughlin, how much do you allow him for:

    (a) Parts and accessories, $3,000.

    (b) Notes and accounts receivable, $200.

    (c) Cars, $5,720.

    (d) Shop equipment, $1,515.85.

2. If you find for McLaughlin, then state what amounts, if any, you deducted as offsets for:

    (a) Attorney fees and court costs in cases: The Interstate Securities Company v. Ferguson-Olander, none.

        The Interstate Securities Company v. Ford Motor Company, none.

    (b) Money value of property turned over to receiver in this action, $1,392.56.

    (c) Fraudulent or fictitious contracts endorsed by plaintiff, $7,046.97.

3. When did the defendant, through its agents, take charge of the property involved herein? A. March 2."

Appellant did not object to finding number 2, which gave it a setoff for the full amount it claimed to have lost by virtue of the fictitious contracts, executed prior to February 21, 1938. Appellant objected to special findings numbers 1 and 3, and to the general verdict for actual damages on the ground they were not supported by the evidence, and objected to the verdict for punitive damages on the ground it was rendered under bias and prejudice.

As previously stated herein, the evidence pertaining to finding number 3 was conflicting. On review this court is concerned only with the question whether there is substantial evidence to support findings made and not with evidence which, if believed, would support contrary findings. (*Johnson v. Soden*, 152 Kan. 284, 103 P. 2d 812.) There was substantial evidence to support that finding and it is conclusive.

The several items in special finding number 1, equal the amount of the general verdict for actual damages. The evidence clearly supports special findings number 1 (*a*), (*b*) and (*d*). There was ample evidence, if believed, and it apparently was, to support finding 1 (*c*) except for the possibility that there might be some minor discrepancy based upon the balance due upon valid mortgages on certain cars which would determine the net value of appellee's interest in those particular cars. We have carefully and painstakingly reviewed the voluminous record presented by appellant and if such discrepancies exist appellant has failed to disclose and clarify them. Under the circumstances we will not disturb the finding.

Appellant next contends the verdict did not have the independent approval of the trial court. When the jury returned its verdict the trial judge inquired whether in arriving at the general verdict it had deducted the setoff. The foreman replied that it had. The trial judge was unable to approve the general verdict for actual damages in favor of appellee in the sum of $10,435.85, without deducting the setoffs allowed to appellant in special finding number 2, which totaled $8,439.53. The trial judge concluded the foreman probably did not understand his question and that the foreman probably meant the jury had allowed the setoffs for deduction in special finding number 2. It plainly appears from the special verdict that the jury, in finding number 2, intended to allow appellant a total setoff in the sum of $8,439.53. The trial judge commented that except for the answer made by the foreman he would have had no trouble interpreting the verdicts and simply would have deducted the total setoff allowed appellant from the amount of the general verdict for actual damages rendered in favor of appellee. Having concluded the foreman misunderstood his question and that appellant, according to the special verdict, was clearly entitled to a setoff in the sum of $8,439.53, the trial court granted appellee the option, in lieu of a new trial, of accepting the difference between $10,435.85 and $8,439.53, or a verdict of actual damages in the

sum of $1,996.32. Appellee, within the time allowed, elected to accept the option. The trial judge approved the verdict for actual damages in the sum of $1,996.32, and for punitive damages in the sum of $8,000 and denied appellant's motion for a new trial.

It is unnecessary to review the numerous authorities cited in support of the respective contentions of the parties. In order for a verdict to stand the trial judge must, of course, approve it upon his own independent judgment and not upon that of the jurors. (*Possey v. Johnson*, 145 Kan. 742, 67 P. 2d 598.) The general verdict and the special verdict had to be considered, interpreted and harmonized if it was reasonably possible to harmonize them. We think the trial judge properly interpreted and harmonized them and that as so harmonized the verdict for actual damages in the sum of $1,996.32 had the approval of his own independent judgment. Under these circumstances that portion of the judgment will not be disturbed.

Appellant earnestly argues the verdict for punitive damages is excessive and the result of bias and prejudice, and that at least a new trial should have been granted. In *Stoner v. Wilson*, 140 Kan. 383, 36 P. 2d 999, we quoted with approval a pertinent statement from 8 R. C. L. 680, where it is said:

"It is difficult to lay down any rule by which to test the question of excess in a verdict for punitive or exemplary damages. At common law the amount was left almost entirely to the jury, and the courts generally refused to grant a new trial on the ground that the award was excessive, and would do so only in a glaring case of outrageous damages, and which all mankind at first blush must think so. It is now generally held, however, that the jury is not at liberty, unrestrained, to award by way of punitive damages any amount, regardless of how large .it may be. While their verdict will not be set aside unless it is so large as to satisfy the court that it was not the result of an honest exercise of judgment, an award of exemplary damages is subject to revision by the court to the same extent as awards of compensatory damages, and will be set aside if it is grossly excessive or appears to be the result of passion or prejudice or improper sympathy. The court will not interfere except in extreme cases, however, and where it appears that an injustice has been done, and, perhaps, will proceed with more caution in such a case than where only compensatory damages are involved." (p. 395.)

From the foregoing statement it will be observed the award of exemplary damages will not be entirely set aside unless it is so large as to satisfy the court that it was not the result of an honest judgment. The trial court was not satisfied the instant award for punitive damages was the result of a dishonest judgment

of the jurors and neither are we. That fact, however, does not necessarily keep the verdict from being excessive. Again, as noted in the above quotation, an award for punitive damages, as an award for compensatory damages, is subject to revision if it is grossly excessive. Punitive damages are imposed by way of punishing a defendant for malicious or vindictive acts or for a willful and wanton invasion of plaintiff's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. (*Stalker v. Drake*, 91 Kan. 142, 136 Pac. 912; *Stoner v. Wilson*, supra.)

Appellant argues there was no evidence to justify the trial court in instructing the jury upon the subject of punitive damages. With that contention we cannot agree. This case, however, was not the ordinary kind of a case in which a mortgagee wrongfully and by force takes property described in a chattel mortgage. Appellant previously had been defrauded by appellee and while at least some of appellant's conduct was willful and wanton, much of it undoubtedly was also prompted by appellee's own fraudulent acts. True, appellee's fraudulent acts did not legally justify appellant's conduct, but it is evident from the record before us that appellee's prior fraudulent acts materially affected appellant's attitude and conduct. From the record it is quite clear and very probable that, by reason of appellee's previous fraud, appellant was fearful of suffering further loss and that its conduct was prompted and motivated as much by a desire to prevent additional loss and to recoup its existing loss as it was to maliciously and wantonly invade appellee's rights. After careful consideration of the entire case and after making every fair allowance for what we believe might reasonably constitute differences of opinion, we are constrained to hold the award for punitive damages is at least $4,000 too much.

Where a verdict manifestly is rendered under the influence of passion and prejudice, it, of course, cannot be cured by a remittitur, but where it is not based thereon the vice in an excessive verdict frequently can be cured by a remittitur consented to by the prevailing party. (*Truman v. Railroad Co.*, 98 Kan. 761, 767, 161 Pac. 587; *Leinbach v. Pickwick Greyhound Lines*, 135 Kan. 40, 56, 10 P. 2d 33, and numerous cases therein cited.) The case will be remanded to the district court with instructions to give appellee the option of a modified judgment fixing his punitive damages at $4,000 with the alternative that a new trial be granted as to

all issues. In the event appellee elects to accept such option the judgment for actual damages in the sum of $1,996.32 and for punitive damages in the sum of $4,000 is hereby approved.

PARKER, J., not participating.